UNITED STATES of America,

v.

Yuli Mar GONZALEZ–BELLO,
Defendant.

No. 96–CR–875 (JG).

United States District Court,
E.D. New York.

June 26, 1998.

MEMORANDUM AND ORDER

GLEESON, District Judge.

On April 21, 1998, I sentenced the defendant Yuli Mar Gonzalez–Bello to a 63–month term of imprisonment, to be followed by a 4–year term of supervised release. The sentence was the result of a *sua sponte* departure from the sentencing range prescribed by the United States Sentencing Guidelines.

I departed because (a) Gonzalez–Bello wanted to cooperate with the government from the outset of the case; (b) the government wanted her cooperation; (c) her defense lawyer, who suffered from a conflict of interest arising out of his receipt of a "benefactor payment," affirmatively obstructed her effort to cooperate; and (d) the attorney's conduct deprived Gonzalez–Bello of the opportunity to cooperate against at least one drug trafficker, and possibly more, and thus to obtain the substantial benefit of a motion pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 5K1.1 and 18 U.S.C. § 3553(e).

On April 28, 1998, the government moved pursuant to Rule 35(c) of the Federal Rule of Criminal Procedure to correct the sentence on the ground that the departure was the result of "clear error." The timing of the motion required that it be acted upon virtually instantaneously. I denied it that same day in an order stating that this opinion would follow.

A. *Background*

The defendant, who is now 26 years old, is a resident of Caracas, Venezuela. She was raised by her mother and stepfather, who were alcoholics. Her stepfather physically abused her, including one knife-slashing incident that required stitching of three of her fingers. As a ten-year old, she was sexually assaulted twice by her mother's friends, incidents for which she received counseling by a prison psychologist while awaiting sentencing in this case. By age fourteen, she had moved out of her mother's home to live with a boyfriend.

The defendant had minimal contact with her father during her childhood. However,

Joel S. Walter, Walter & Levinson, Brooklyn, New York, for Defendant.

Zachary W. Carter, United States Attorney, Brooklyn, New York By James E. Tatum, Jr., Assistant United States Attorney, for U.S.

when he became gravely ill, and no other family member would care for him, he moved in with the defendant in Caracas. She attended high school part-time while caring for him. In 1993, when she was 21, she received the equivalent of a high school diploma, and her father died.

The defendant went to work as a clerk in two dry cleaning stores in Caracas. She left the second of those jobs to work in a third dry cleaners, the Tamanaco Dry Cleaners, with her new boyfriend (now fiancé), Jose Do Vole.

### B. The Arrest of Jose Do Vole and the Other Couriers

On May 17, 1996, Jose Do Vole was arrested at John F. Kennedy International Airport ("JFK Airport") in possession of 313 grams of heroin, which was sewn into the linings of a suitcase and several sport jackets, including one he was wearing. During a search incident to the arrest, agents discovered a business card for the Tamanaco Dry Cleaners. On the back of the card was a telephone number and the name "Yuli." Yuli is the defendant. At the time of Do Vole's arrest, he was the general manager of the Tamanaco Dry Cleaners, and the defendant was his employee.

On May 18, 1996, the day after Do Vole's arrest, another courier (the "second courier") was arrested at JFK Airport. Like Do Vole, he had a business card for Tamanaco Dry Cleaners in Caracas, which had Do Vole's name embossed on the front and "Yuli Mar Gonzalez" handwritten on the back, together with the same telephone number that was written on the card seized from Do Vole the day before. He was carrying 1.56 kilograms of heroin concealed in two suitcases and a sport jacket.

On July 1, 1996, another courier (the "third courier") was arrested at JFK Airport. This courier had 2.57 kilograms (gross weight) of heroin hidden in suitcases and sport jackets, and also had a piece of paper with the defendant's name and the same telephone number written on it. In a post-arrest statement, this courier stated that the defendant had accompanied him on the flight from Venezuela.

On July 11, 1996, a fourth individual (the "fourth courier") was arrested, this time at Miami International Airport, with 1.81 kilograms (gross weight) of heroin. This courier had a Tamanaco Dry Cleaners business card with the defendant's name and telephone number on the back.

### C. The Arrest of Gonzalez–Bello

On July 3, 1996, the government sought and obtained an arrest warrant for Gonzalez–Bello. The affidavit submitted in support of the request described the arrests of Do Vole, the second courier and the third courier. It also stated that Do Vole "acknowledged that he works at Tamaco (sic) Dry Cleaners in Caracas, Venezuela." Complaint and Affidavit in Support of Arrest Warrant dated July 3, 1996, at ¶ 1.

As noted above, the defendant had come to New York on July 1, 1996, to visit Do Vole at the Metropolitan Detention Center in Brooklyn, New York (the "MDC"). During one of the defendant's visits to the jail, a woman who was visiting another inmate invited the defendant to stay at her apartment in Queens, New York. On August 22, 1996, while visiting Do Vole at the MDC, the defendant was arrested on the outstanding warrant.

In the agents' car after her arrest, Gonzalez–Bello admitted that some of her acquaintances were drug traffickers, that she had a fraudulent passport, that she had accompanied the second courier on July 1, 1996, and that she had gone to the MDC to visit her fiancé, Do Vole. After making those statements, she said she wanted to speak to a lawyer, and the interrogation ceased. At her arraignment on August 22, 1996, Scott Auster, Esq., was assigned under the Criminal Justice Act to represent the defendant. A detention hearing was held, and she was ordered detained by the magistrate judge and taken to the MDC. Gonzalez–Bello never saw or spoke to Mr. Auster again.

### D. The Appearance Of Retained Counsel And The Destruction Of Gonzalez–Bello's Opportunity to Cooperate

The Speedy Trial Act required that any indictment of Gonzalez–Bello be filed on or

before September 21, 1996. *See* 18 U.S.C. § 3161(b). On September 20, 1996, she was brought before Magistrate Judge Robert M. Levy. A new attorney, Eugene Bogan, Esq., appeared for her on that date. Judge Levy entered an Order of Excludable Delay, extending the period within which to indict the defendant to October 19, 1996. The order was entered on consent, and the stated purpose of excluding the time was to allow the parties to "engag[e] in continuing plea negotiations." Order of Excludable Delay dated September 20, 1996.

Bogan was retained, but he was not retained by Gonzalez–Bello. He showed up one day at the MDC and told her, "I am your attorney, your friend contracted me to represent you." Tr. 11.[1] Bogan stated that he had been hired by Edgar Suarez, a Colombian acquaintance of Gonzalez–Bello. Gonzalez–Bello immediately told Bogan she wanted to cooperate with the government. Bogan then told her, falsely, that she would get the same prison term whether she went to trial or cooperated.

At that early juncture, less than one month after her arrest, Gonzalez–Bello had information about the narcotics trafficking of Gabriel Velasquez. Tr. 15. She also had information about Ingrid Barbosa who, along with her boyfriend, was an active member of the Caracas-based drug distribution ring whose heroin had been seized from Do Vole and the three other couriers. Tr. 18, Presentence Report ("PSR") ¶ 10. Both Gonzalez–Bello and Do Vole were low-level members of this organization. He was a courier. She was solicited by Barbosa to be a courier as well, but declined. PSR ¶ 10. Instead, she introduced four others to Barbosa to act as couriers.

The government was interested in the information Gonzalez–Bello could provide. Indeed, on the day of her arrest, she was specifically questioned about Gabriel Velasquez. Tr. 20. He was arrested approximately eight months later. Tr. 15, 21. The

nature of the government's investigative interest, if any, in Barbosa and her boyfriend is less clear. However, the defendant's presentence report states (presumably based upon the information provided by the second, third and fourth informants, who are described as "cooperating witnesses") that Ingrid Barbosa was in charge of getting the heroin placed in the suitcases and sports jackets and supplying those items (through Gonzalez–Bello) to the couriers. PSR ¶ 7.

Although Gonzalez–Bello had the desire to cooperate, and information about at least one person the government was investigating, her lawyer obstructed her path. He told her she was "not going to get anywhere" by cooperating, that "the best thing for [her] was to go to trial," and that, no matter what she did, she "was going to be given many years [in prison]." Tr. 15. Bogan eventually did more than simply discourage Gonzalez–Bello from cooperating. In the one proffer session[2] she had while he represented her, he gave her advice that essentially destroyed her ability to cooperate. Specifically, he told her that since she would eventually be going to trial, she had to "declare [her]self not guilty" of trafficking in drugs. Tr. 17–20. Gonzalez–Bello followed that instruction. Not surprisingly, her false denial of her own criminal acts made her an unattractive candidate for cooperation, and no agreement was reached.

### E. Gonzalez–Bello's "Supervisor" Status

The fact that Gonzalez–Bello introduced four others to Barbosa to act as couriers is extremely significant under the sentencing guidelines. As discussed below, it permitted Gonzalez–Bello to be characterized as a "supervisor," warranting an upward adjustment for an aggravating role in the offense, which produces a much higher guideline range than the one applicable to "mere couriers." In this case, the "supervisor" label was especially misleading. Gonzalez–Bello, an immature

---

1. "Tr." refers to the pages of the transcript of the sentencing proceeding on April 17, 1998. "Tr." followed by a date refers to the transcript of proceedings on the specified date.

2. Proffer sessions are meetings between prosecutors (and law enforcement agents) and prospective witnesses in which the would-be witness is debriefed in an effort to determine if a cooperation agreement can be reached. *See United States v. Fagge,* 101 F.3d 232, 233 (2d Cir.1996).

and scared young woman, did not have the mettle to join her fiancé in the ranks of the couriers. She could only recommend others to take that risk. Moreover, there is no evidence that she was paid by Barbosa for this "recruitment." Rather, she was to be paid by the courier; for example, she received $1,000 from one of the couriers, and she promptly used the money to buy an airplane ticket to visit Do Vole in the Brooklyn jail. *See* PSR ¶ 10. A common sense evaluation of the evidence before me leads to the conclusion Gonzalez–Bello had a lesser role in the offense than the couriers.

This is further revealed by the defendant's conduct after the arrest of her fiancé. Supervisors in drug rings do not usually fly into the United States to spend six weeks paying personal visits to arrested couriers in United States prisons, especially where, as here, those couriers can easily be linked to the supervisor. If they did, the supervisors would walk right into arrest warrants, as Gonzalez–Bello did.

F. *Gonzalez–Bello's Plea Agreement and Guilty Plea*

On October 28, 1996, I set the case down for trial on December 16, 1996, and directed that any defense motions be filed by November 18, 1996. No motions were filed by that date. By letter dated December 4, 1996, Bogan asked for adjournments of the motion schedule and the trial date. He stated that "although there is on going (sic) dialog (sic) between myself and the Assistant U.S. Attorney regarding the Disposal (sic) of this case, I feel delict (sic) in my responsibility to my client should a motion not be filed (sic)." Letter from Eugene Bogan, Esq., to the Court dated December 4, 1996, at 2. The requests for adjournments were denied, but Bogan was permitted to file untimely motions at the conference held on December 6, 1996.

At that December 6 conference, Bogan reported that the proffer had not produced "fruitful results." He also asked for a bill of particulars and other disclosures from the government. Bogan reported that he had just received that day—10 days before trial—a copy of a consensual tape recording that the government intended to offer at trial. When asked why he had failed to satisfy the disclosure requirements in Fed. R.Cr.P. 16 sooner, the Assistant United States Attorney ("AUSA") responded that the proffer session "did not go as we had planned." Tr. December 6, 1996, at 4.

After I addressed Bogan's applications and denied his motion for a bill of particulars, the government moved orally for an adjournment of the trial. The AUSA stated that he could not be ready to try the case on December 16. Because his stated reasons were insufficient and the defendant was in custody, I denied the motion. Tr. December 6, 1996, at 9–12.

Late on December 13, 1996, the Friday before trial was to begin, the parties asked for permission to appear for a guilty plea. There was a written plea agreement. In exchange for pleading guilty to Count One, the government dropped the mandatory "10–life" character of that charge and let Gonzalez–Bello plead guilty to the "5–40" year version of the same charge. It also agreed to dismiss the remaining counts in the indictment. From the perspective of Gonzalez–Bello, the bargain gave her very little. The elimination of the 10–year mandatory minimum had little value because her guideline range (as estimated in the plea agreement and as calculated in the presentence report) exceeded 10 years, and the dismissed counts would have had no effect on her guideline range even if she had pleaded guilty to them as well.

Gonzalez–Bello also failed to benefit from a form of plea bargaining that commonly occurs in this district and elsewhere. Defendants often plead guilty in exchange for the prosecutor's agreement to take lenient positions on factual issues that directly bear on the defendants' guideline range, such as the amount of drugs attributable to the defendant or her role in the offense. Sometimes this bargaining occurs when the facts are genuinely unclear, and the prosecutor agrees not to advance the more aggressive of the plausible arguments. On other occasions the facts are plenty clear, but the prosecutor nonetheless agrees to recommend and support a more lenient result than the facts warrant. This practice is described by Professors Steven J. Schulhofer and Ilene H. Nagel as "guidelines factor bargaining." S.J. Schulhofer and I.H. Nagel, "Plea Negotia-

tions Under The Federal Sentencing Guidelines: Guideline Circumvention And Its Dynamics In the Post–Mistretta Period," (91 Nw.U.L.Rev. 1284, 1293 1997). Schulhofer and Nagel observe that:

Guidelines factor bargaining remains common, especially regarding the "role in the offense" Guidelines provision. The common pattern is for the prosecutor to agree to recommend, or not to oppose, a reduction for minor or minimal role when the facts do not support the recommendation. Typically, the plea agreement acknowledges that such a recommendation is not binding on the court, and in some instances the probation officer successfully challenges it. More often, however, the sentencing judge accepts the Assistant U.S. Attorney's interpretation even if it is factually dubious.

*Id.*

■■■ No such bargaining occurred here. Rather, under the plea agreement obtained by Bogan, the government would recommend

that Gonzalez–Bello be held accountable for the drugs carried by all four of the arrested couriers. Also, whereas Do Vole had received a 4–level downward adjustment because of his "minimal role" as a courier, Gonzalez–Bello's plea agreement allowed the government to recommend an *upward* adjustment to her offense level on the ground that the "Defendant was an (sic) supervisor in activity." Plea Agreement at ¶ 2. As noted above, this supervisory status was based on her recruiting others to become couriers. The law supports this result, *see, e.g., United States v. Williams,* 23 F.3d 629, 635 (2d Cir.), *cert. denied,* 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 547 (1994), but, as mentioned above, the government does not always insist on it. Sometimes it engages in guideline factor bargaining that spares the defendant the consequences of a remorselessly rigid application of the guidelines in computing the offense level.[3]

In this case, Bogan's failure to bargain for leniency regarding his client's role in the

3. A recent example is the case *United States v. Leboyd Rivera,* 97–CR–432 (JG). Rivera was arrested in April 1997, at JFK Airport. He and another individual, Georgianna Michios, were each in possession of substantial quantities of cocaine, which they had imported into the United States from Aruba. Rivera pled guilty and cooperated, eventually testifying at the trial of a third individual. Although Rivera's presentence report correctly stated that Rivera had recruited Michios to become a courier, the presentence report accorded Rivera a downward adjustment of four levels. The government essentially conceded that Rivera had received a break in the calculation of the guidelines:

THE COURT: ... the guideline calculation for Mr. Rivera includes a four-level downward adjustment for role in the offense. He recruited Ms. Michios ... into this conspiracy. Am I correct in thinking that if the relationship were more adversarial between the government and this defendant, ... the government would be arguing not only that there shouldn't be a four-level downward adjustment but there ought to be a two-level upward adjustment because he recruited a courier into this?

[The AUSA]: Well, perhaps. Frankly, given that it is not as adversarial a situation as normally would be in a situation like this, the government hasn't looked at the issue all that carefully. Although it is a circumstance in which, absent the recruiting of Ms. Michios, he falls within the category of a courier and one that ap-

pears before the court commonly. But perhaps the court is right.

*United States v. Rivera,* 97–CR–432 (JG), Sentencing Proceedings (May 13, 1998). The break for Rivera was big: the government could have argued, based on the recruiting activity, for a guideline range of 57–71 months; instead, his range was 30–37 months.

One does not have to cooperate in order to benefit from guidelines factor bargaining. For example, in *United States v. Varisco,* 97–CR–476 (JG), the defendant pled guilty to aiding and abetting the possession of an unregistered bomb, in violation of 26 U.S.C. §§ 5861(d) and 5871. The bomb was detonated at his ex-girlfriend's house, causing a fire that seriously burned her. Since the express purpose of possessing the bomb was to set it off at her house, the 4–level enhancement in U.S.S.G. § 2K2.1(b)(5) was plainly applicable. However, in exchange for an eleventh-hour guilty plea in what the government conceded was a difficult case (the defendant was in prison when the bombing occurred), the government agreed to recommend an offense level that did not include the 4–level enhancement.

Similarly, in *United States v. Velez–Osorio,* 97–CR–233 (JG), the defendant owned a car that was specially fitted with a secret compartment used to conceal drugs. He participated in negotiations with his prospective purchaser, and then was arrested before he could sell the five and one-half pounds of cocaine secreted in the compartment. Despite these facts, the government recommended, pursuant to a plea agreement, that the defendant receive the 4–level minimal

offense was especially costly to her. As noted, instead of a 4–level downward adjustment, she received a 3–level upward one.[4] Even more damaging, her supervisory status was the reason she failed to qualify for the two-level "safety valve" adjustment in § 2D1.1(b)(6). *See* Tr. at 27. Thus, Gonzalez–Bello's treatment as a supervisor cost her 9 levels on the sentencing chart. Guideline factor bargaining on this one issue alone would have resulted in a total offense level of 22 rather than 31, which would have lopped 67 months off the bottom end of her sentencing range.

Gonzalez–Bello's effort to plead guilty on December 13, 1996, was unsuccessful. When she appeared before me on that date, she was panic-stricken. She had recently been placed in solitary confinement within the prison. Part of defense counsel's job is to prepare the client to plead guilty, but Gonzalez–Bello was woefully unprepared for the event. She cried uncontrollably, and could not admit her guilt. The parties were directed to return on December 16, 1996, to select a jury.[5]

On December 16, 1996, the morning of jury selection, Gonzalez–Bello sought once again to plead guilty pursuant to her agreement with the government. She seemed calmer than she had been on the previous Friday. Tr. December 16, 1996, at 5. The AUSA reported that she had finally been removed from solitary confinement. She admitted having introduced one of the couriers to Barbosa, knowing that he would be used to transport heroin. *Id.* at 11–12. I accepted the plea of guilty.

As I mentioned at the sentencing sixteen months later, the defendant's guilty plea left an indelible impression on me. Although I was not aware at that time that Bogan had been paid by someone else to represent her, it was clear that the defendant was being served up to the Court in a most unfavorable position. Essentially, she had received nothing of value in her agreement with the government. Her plea was offered so late that she failed even to qualify for the third level off for timely acceptance of responsibility. She pled guilty to charges that the prosecutor was admittedly unprepared to try. There was no doubt in my mind that I would have granted a motion to withdraw the guilty plea if one were made at a later time. *See* Tr. 26.

---

role adjustment routinely accorded to mere drug couriers. By contrast, on similar facts, but in the absence of a plea agreement, the government contended at the trial of *United States v. Brian Rodriguez*, 96–CR–586 (JG), that the defendant's ownership of a van with a secret compartment for storing drugs demonstrated his central role in the drug deal.

The degree to which the guidelines are compromised by such bargaining is difficult to quantify, as the results appear in the Sentencing Commission's data as within-the-guidelines sentences. Schulhofer and Nagel estimate that guidelines factor bargaining results in "guidelines evasion or circumvention in roughly 20–35% of cases resolved through a guilty plea." 91 Nw.L.Rev. at 1290 (footnote omitted).

Some observers decry these guidelines compromises, asserting that they reintroduce the disparities in sentencing that the Sentencing Guidelines were designed to eliminate. *See Id.* at 1303–04. I disagree. The principal purpose of the Sentencing Reform Act of 1984 was to restrain *judicial* discretion. Plea agreements that seek to compromise the applicable guidelines range are generally the result of one or more of a wide variety of considerations that properly influence the decisions of both prosecutors and defense attorneys. Those considerations, and the agreements they produce, generally deserve the deference of judges, even if they result in sentences that are below the range that a strict adherence to the guidelines manual would prescribe. *See* J. Gleeson, "Sentence Bargaining Under The Guidelines," 8 Federal Sentencing Reporter 314 (1996). The plea bargaining process would be better served if the guidelines, which are ambivalent on this issue, instead expressly permitted such sentence bargaining. *Id.* at 316–17. Such a change might eliminate the unseemly practice of prosecutors and defense attorneys recommending—and district courts adopting—sentencing calculations that the facts do not warrant. *See id.*

4. Because the criminal activity Gonzalez–Bello "supervised" involved five or more participants, she received a three-level adjustment, rather than a two-level one. *See* U.S.S.G. § 3B1.1(c).

5. The unscheduled appearance late in the day on Friday, December 13, 1996, is not reflected on the docket sheet, and my efforts to identify the court reporter who transcribed the proceedings have been unavailing. The parties do not dispute what occurred, and the transcripts of proceedings on the following Monday, December 16, 1996, and at sentencing, contain statements that indirectly memorialize the event. *See, e.g.,* Tr. 26–27; Tr. December 16, 1996, at 2–3, 5.

### G. *Bogan's Illness And Death*

After her guilty plea, Gonzalez–Bello languished in jail because her attorney became ill. The correspondence seeking adjournments in the sentencing date reveals that on February 13, 1997, Bogan went into a diabetic coma and was hospitalized. He was found to be suffering from chronic renal failure. His condition did not improve, and he was scheduled to have surgery on April 18, 1997. By letter dated June 12, 1997, I was notified that Bogan had died of kidney failure and a heart attack.

### H. *The Appointment Of New Counsel And The Renewed Efforts To Provide Cooperation*

The following day, June 13, 1997, I appointed Joel S. Walter, Esq., pursuant to the Criminal Justice Act to represent Gonzalez–Bello. He sought to obtain for her the benefits of cooperation, and the government was still interested in her cooperation. By letters dated September 18, 1997, and October 14, 1997, the AUSA sought and obtained continuances of the sentencing date. The virtually identical letters said, "The reason for the continuance is that the defendant is attempting to cooperate with the government. The requested adjournment will allow the defendant any (sic) opportunity to continue her efforts to substantially assist the government prior to sentencing."

The government's requests for continuances in November 1997 and January 1998 were worded differently. Gonzalez–Bello was no longer "attempting to cooperate;" both letters stated, "The reason for the continuance is that the defendant is still cooperating with the government." [6] A status conference on March 27, 1998, revealed that Gonzalez–Bello had also been debriefed by an Assistant United States Attorney in the Southern District of New York.

In the end, Gonzalez–Bello was unable to obtain a written cooperation agreement.

The record before me reveals ample prosecutorial interest in her cooperation and extensive efforts by her to provide it. It also reveals that Gonzalez–Bello had useful information about at least one person—Gabriel Velasquez—who the government was investigating and eventually prosecuted. The reason Gonzalez–Bello was unable to execute a cooperation agreement is clear and undisputed: Bogan obstructed her effort to cooperate; she did not begin to provide information until June 1997, when replacement counsel was appointed; and by then Velasquez was already arrested and Gonzalez–Bello's information was stale. Tr. 14–19.

### I. *The Sentencing*

Gonzalez–Bello was sentenced on April 17, 1998. The presentence report charged to her account the drugs seized from Do Vole and the other three couriers, resulting in a base offense level of 34. It gave her a three-level enhancement for her supervisory role. Because she failed to plead guilty in a timely manner, she received only a two-level downward adjustment for acceptance of responsibility. The total offense level was 35. Because Gonzalez–Bello had no criminal history, her guideline range was 168–210 months.

Mr. Walter, the defendant's attorney, objected to the presentence report in a letter to the probation officer dated April 7, 1998. The letter informed the Court and the government as follows:

> I have been advised by Ms. Gonzalez–Bello that upon her arrest, she was desirous of cooperating with customs officials. In fact, as noted in paragraph two of your report, the defendant began to provide basic information to the arresting agents.
>
> The defendant further informs me that the people for whom she worked (drug importation) retained Eugene Bogan, Esq. to represent her. She advised that from beginning (sic), she pleaded with Mr. Bogan to allow her to cooperate, but Mr.

---

**6.** The four referenced letters requesting adjournments of sentence were filed under seal, as the public revelation of a defendant's efforts to assist the government in its investigation of drug traffickers can place the cooperator and her family in grave danger. Because the facts regarding Gonzalez–Bello's efforts to cooperate have now been aired publicly (at her sentencing hearing), and neither side has sought to seal that proceeding, the above-mentioned letters are hereby ordered unsealed.

Bogan advised her to take her case to trial, a strategy to which, against her better judgment and wishes, she agreed.

Just prior to trial, she advises, she tearfully pleaded with Mr. Bogan to "allow her" to plead guilty. She claims that due to her unfamiliarity with the american (sic) judicial system, she could have cooperated with the agents regardless of the advice of her attorney and believes that Mr. Bogan's sole interest was not to have her provide information against people who had paid his fee. Insofar as Mr. Bogan is deceased, he cannot refute this claim.

Letter from Joel S. Walter, Esq., dated April 7, 1998, at 1. Based on these facts, Mr. Walter sought only the one-level further reduction for timely acceptance of responsibility, see U.S.S.G. § 3E1.1(b), on the theory that Bogan's conflicted representation obstructed an early plea of guilty. *Id.* at 2. At sentencing, I held a hearing on this claim, at which Gonzalez–Bello testified. I then granted the application for the additional level for acceptance of responsibility. Tr. 26–27.

The April 7, 1998, letter from defense counsel also sought a two-level "safety valve" adjustment pursuant to U.S.S.G. §§ 2D1.1(b)(6) and 5C1.2. The government opposed the application. It did not dispute defendant's contention that she had truthfully disclosed a great deal of information to the government; rather, it relied solely on defendant's "supervisory" role, which disqualified her for the adjustment. Tr. 27. I sustained the government's position and declined to make the adjustment.

The only other adjustment to the offense level calculations was made *sua sponte*. Because the presentence report stated that there was no laboratory analysis report for the heroin seized from the third and fourth couriers (*see* PSR ¶¶ 5 and 6), I eliminated

that heroin from the calculation, reducing the base offense level from 34 to 32.[7]

Finally, I granted a joint application for a one-level downward departure based on the defendant's agreement to a stipulated order of deportation. Tr. 32. The resulting offense level, including the one-level downward departure, was 31, with a corresponding range of imprisonment of 108–135 months.

I then departed downwardly. Although the departure was *sua sponte*, it was based on the argument advanced by defense counsel in support of his application for the third "point" for timely acceptance of responsibility. I concluded that those facts presented a circumstance of a kind not considered by the Sentencing Commission. Specifically, I found that Gonzalez–Bello was represented by a lawyer who did not represent her interests, Tr. 34, that she was "ideally situated to benefit from the escape·hatch provided by [U.S.S.G. § ] 5K1," and her lawyer "not only fail[ed] to avail the defendant of that opportunity but affirmatively obstruct[ed] it." Tr. 35–36.

In determining how far to depart, I was influenced by my finding that the defendant was less culpable than her fiancé, Do Vole, who had been sentenced to 60 months in prison.[8] Tr. 3, 36. Accordingly, I departed five levels—to level 26—and imposed a sentence of 63 months in prison.

### DISCUSSION

Much has been written about the power given to federal prosecutors by the United States Sentencing Guidelines. Now ten years old, the guidelines establish an elaborate mechanism to prescribe sentences for federal crimes. Sentencing discretion, which was previously limited only at the upper end by the statutory maximum sentence, has been restricted by the creation of relatively narrow sentencing ranges. The system precludes sentences above or below the pre-

---

**7.** At sentencing, the AUSA asserted that he in fact had received laboratory reports for all of the couriers' drugs, and had them in his office. Upon reflection, I conclude that the government should have been given an opportunity to prove the amounts of heroin seized from those couriers. However, this issue affects neither the reason for the departure in this case nor the degree

of the departure. The defendant's sentence would have been the same even if her base offense level had remained at 34.

**8.** Do Vole did not cooperate or otherwise obtain a downward departure, except for the one-level departure for stipulating to deportation. Tr. 4.

scribed range if the case is an ordinary one. *Koon v. United States*, 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). However, Congress preserved for district judges the discretion to sentence outside the prescribed range if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(h); *see also* U.S.S.G. § 5K2.0.

The guidelines themselves, together with the Commission's policy statements and official commentary, are the place to look to determine what was considered by the Commission. *Koon*, 518 U.S. at 92–93, 116 S.Ct. 2035. The Introduction to the Guidelines states: "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." 1997 U.S.S.G. ch. 1, pt. a, intro comment. 4(b). The Commission expressly stated that it intended such departures to be rare, occurring only in "unusual cases." *Id.* Certain factors, such as race or sex, can never be bases for departure. Other factors are "encouraged bases" for departure (*e.g.*, victim provocation), and still others are "discouraged bases" (*e.g.*, family ties and responsibilities). *Koon*, 518 U.S. at 93–94, 116 S.Ct. 2035.

The Supreme Court has instructed that district courts considering a departure should ask the following questions:

— what features of the case potentially take it outside the 'heartland' and make it special, or unusual?

— is a departure based on those features forbidden?

— is it encouraged?

— is it discouraged?

— if the distinctive features are unmentioned in the guidelines, is it sufficient to take it out of the applicable guideline's heartland, taking into account the structure and theory of the individual guidelines at issue and the guidelines taken as a whole?

*Koon*, 518 U.S. at 95–96, 116 S.Ct. 2035.

■ There are several factors which, taken together, take this case out of the heartland of typical drug smuggling cases. Throughout the proceedings, the defendant strongly desired to cooperate. She also had someone to cooperate against (Gabriel Valasquez) in whom the government had a strong investigative interest. She did not choose to be represented by Bogan, rather, his representation was thrust upon her, and given her youth, immaturity and unfamiliarity with our legal system, she had no reason to believe she had any choice in the matter. Bogan did not simply fail to advise his client about cooperation; he obstructed her efforts to provide it.[9] Finally, the time that passed while the defendant was prevented from rendering assistance to the government deprived her of the opportunity to provide meaningful assistance after conflicted counsel was no longer on the scene.

The Sentencing Commission has not forbidden departures based on these circumstances. Nor are they among the discouraged or encouraged factors. Therefore, bearing in mind the structure and theory of the guidelines as a whole, the specific guidelines at issue here, and the principle that departures on grounds not mentioned by the Commission should be highly infrequent, I have determined that these features of the defendant's case were sufficient to take it out

---

9. That Bogan would act this way is, unfortunately, not surprising. He was paid by a third party to represent Gonzalez–Bello. "Ethical considerations warn against an attorney accepting fees from someone other than her client," *United States v. Locascio*, 6 F.3d 924, 932 (2d Cir.1993), *cert. denied, Gotti v. United States*, 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365, because such

"benefactor payments" raise "an ethical question 'as to whether the attorney's loyalties are with the client or the payor.'" *Id.* (citing *In re Grand Jury Subpoena*, 781 F.2d 238, 248 n. 6 (2d cir.) (en banc), *cert. denied, Roe v. United States*, 475 U.S. 1108, 106 S.Ct. 1515, 89 L.Ed.2d 914 (1986)).

of the heartland, thus permitting a downward departure.

The structure of the guidelines as a whole played a central role in my decision to depart. Prosecutors have been using cooperating witnesses (*i.e.*, criminal defendants who plead guilty and testify) to build their cases seemingly forever, and these witnesses have traditionally been shown leniency at sentencing as a reward. *See United States v. Ross,* 719 F.2d 615, 623 (2d Cir.1983) (Friendly, J., concurring and dissenting). However, "[t]he Sentencing Guidelines obviously have altered the way the sentencing process works, and the effect on the cooperating witness scenario is no exception." *United States v. Ming He,* 94 F.3d 782, 788 (2d Cir.1996). In that setting, the alterations effected by the guidelines have significantly diminished the power of judges and correspondingly enhanced the role of both counsel—prosecutor and defense attorney.

As mentioned, the guidelines have replaced essentially unlimited sentencing discretion with a detailed calculus that prescribes sentencing ranges. Apart from the guideline factor bargaining described above, the only readily available escape from these prescribed sentencing ranges is cooperation with the government.[10] United States Sentencing Guidelines Section 5K1.1 allows a district judge to depart from the applicable sentencing range if the defendant has "provided substantial assistance in the investigation or prosecution of another person." *Id.* Substantial assistance to the government is also an avenue of relief from the mandatory minimum sentences applicable to most drug traffickers. 18 U.S.C. § 3553(e).

 : Rendering substantial assistance, however, is not enough. Both U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) require a motion from the government. In the absence of a plea agreement, the government

may decline to make such a motion for any reason other than an unconstitutional one, such as race or religion. *Wade v. United States,* 504 U.S. 181, 185–86, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992). Even when there is a cooperation agreement, the government invariably reserves to itself the right to determine whether the assistance is "substantial," and thus can refuse to make a motion as long as it does not choose that course "invidiously or in bad faith." *United States v. Rexach,* 896 F.2d 710, 714 (2d Cir.), *cert. denied,* 498 U.S. 969, 111 S.Ct. 433, 112 L.Ed.2d 417 (1990). In the absence of a government motion, the sentencing judge cannot sentence below the prescribed range (or mandatory minimum sentence) based on cooperation. Thus, the guidelines give the key to sentencing leniency on this ground to the prosecutor, effecting a profound alteration of the pre-guidelines allocation of sentencing authority.

This regime has empowered prosecutors. Indeed, if Congress had asked federal prosecutors to devise a sentencing scheme that would place the maximum permissible pressure on criminal defendants to cooperate, they could hardly have done better than the Sentencing Guidelines. More than twenty percent of all federal defendants now receive "substantial assistance" motions.[11] Many more cooperate; a recent study by the Sentencing Commission reveals that only 38.6 percent of all defendants who provide assistance to the government receive such motions, and that approximately two-thirds of all defendants provide some assistance to the government. Linda Drazga Maxfield and John H. Kramer, "Substantial Assistance: An Empirical Yardstick Gauging Equity In Current Federal Policy And Practice" (January 1998), at 9–10 (on file with the United States Sentencing Commission).

The Second Circuit has lamented that even though judges are "particularly well-posi-

---

10. The Commission's statistics for the year October 1, 1996 through September 30, 1997, reveal that 67.9% of the persons convicted of federal crimes are sentenced within the applicable guideline range. Only 12.1% received downward departures based on factors other than cooperation, while 19.2% received "substantial assistance" departures. In this circuit there are more downward departures for other reasons

(19.9%), but substantial assistance motions still account for the majority of downward departures (53.37%), and occurred in 22.8% of the sentences. *1997 Sourcebook of Federal Sentencing Statistics,* United States Sentencing Commission, at 53.

11. *See* footnote 10, *supra.*

tioned" (as compared to prosecutors) "to evaluate ... moral worthiness, contrition and rehabilitation," factors that are often critical in the sentencing of a cooperating defendant, the guidelines prohibit a downward departure based on those considerations unless the government authorizes one with a motion. *United States v. Ming He*, 94 F.3d at 788. It finds this "transfer of authority from judges to prosecutors especially troubling" and susceptible of abuse. *Id. But see United States v. Huerta*, 878 F.2d 89, 93 (2d Cir.1989) (placing faith, in rejecting a separation of powers challenge to 18 U.S.C. § 3553(e)'s requirement of a government motion, in the "significant institutional incentives for the prosecution to exercise sound judgment and to act in good faith in deciding whether to make" substantial assistance motions), *cert. denied*, 493 U.S. 1046, 110 S.Ct. 845, 107 L.Ed.2d 839 (1990).

Although reasonable people have reached conflicting assessments of the wisdom of empowering prosecutors in this way, no one disputes that this new regime has elevated the stakes for would-be cooperating witnesses during their proffer sessions with the government. The attorney for the prospective witness plays a crucial role in these sessions. Their clients are usually nervous wrecks: the "interview process intimidates" by itself, and the prospective witness is often expected to incriminate people who kill witnesses and their families. *Ming He*, 94 F.3d at 789–90. The defense lawyer must help the client overcome the natural inclination to deny or minimize her own criminal behavior. The lawyer must be vigilant in advising the client to be entirely truthful from the outset of her relationship with the prosecutor, as a single misstatement—even if collateral in nature and immediately corrected—can result in the withholding of a substantial assistance motion. *See United States v. Brechner*, 99 F.3d 96, 99–100 (2d Cir.1996). In short, "to send a defendant into this perilous setting

without his attorney is ... inconsistent with the fair administration of justice." *Ming He*, 94 F.3d at 790.

To send a defendant into this perilous setting with an attorney with divided loyalties is even worse. Here, Bogan was retained by someone against whom the defendant might provide cooperation.[12] He thus had a powerful incentive to discourage the defendant from attempting to cooperate and, if that failed, to frustrate the attempt. He did both. His advice to her that she had to declare herself innocent of drug trafficking precluded her from reaching an agreement with the government. Because it took nine months for the defendant to get counsel who sought to facilitate, rather than obstruct, her cooperation, her opportunity to obtain the benefit of a substantial assistance motion passed her by.

It bears emphasis that the fact that the defendant had conflicted counsel, standing alone, does not warrant a downward departure. A principal purpose of hiring counsel to represent low-level members of a narcotics conspiracy is to stifle the cooperation that could threaten the ongoing criminal activity. It would be perverse indeed to reward such behavior by granting a downward departure whenever the defendant fails to cooperate. Moreover, most defendants in that situation have no desire to cooperate in any event. Also, many no doubt realize that, by acquiescing in such a lawyer-client relationship, they will have counsel whose options are limited as a result of divided loyalty. After accepting the benefits of counsel retained by a third party, a defendant generally will not be heard to complain about the obvious disadvantages.

It is a combination of several features of this case that make it exceptional. A defendant who had the information and the desire to cooperate, and who stood to benefit great-

12. The defendant said as much to Mr. Walter. *See* Letter from Joel S. Walter, Esq., dated April 7, 1998, at 1, quoted above at page 16. I do not credit defendant's testimony at the sentencing hearing to the extent it suggests that her "benefactor" was not involved in drug trafficking. *See* Tr. 15–16. Nor do I hold that testimony against her. Having learned that the government was

refusing to accord her any benefit for cooperating, and in light of the undisputed fact that her life would be endangered if she identified her benefactor as a drug trafficker, it is neither surprising nor noteworthy that she refused to incriminate "Edgar Suarez" at the public sentencing hearing.

ly from cooperation, had an attorney who did not act in her best interests. Indeed, he acted contrary to those interests, obstructing her effort to obtain the benefits of cooperation, so that by the time she was able to cooperate, she was unable to provide meaningful assistance to the government. Thus, viewing the structure and theory of the guidelines as a whole, particularly as they relate to the sentencing of cooperating witnesses, I conclude that the distinctive features of this case take it out of the applicable guideline's heartland.

■ I further conclude that the downward departure in this case does not offend the particular guidelines at issue. The dramatic difference between the 60–month sentence Do Vole received without cooperation and the 151–188 month range the government argued for lies almost exclusively in the defendant's role in the offense. The guidelines properly distinguish between drug couriers and those who recruit the couriers into the conspiracy. As a general matter, the latter group is more culpable. However, the challenge to any effort to structure sentencing discretion is in the details—the "multifarious, fleeting, special, narrow facts that utterly resist generalization." *Pierce v. Underwood*, 487 U.S. 552, 561–62, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988), *quoted in Koon*, 518 U.S. at 99, 116 S.Ct. 2035. In this case, those facts require the conclusion that the defendant was no more culpable than those she recruited. At the conclusion of a difficult childhood, she went to work for her boyfriend Do Vole at the Tamanaco Dry Cleaners. He became a drug courier. She was recruited to do the same, but declined, and instead arranged for four others to act as couriers. PSR ¶ 10. The only evidence before me of any compensation for the defendant's role in the offense is a $1,000 payment from one of the couriers, which she immediately used to purchase an airline ticket to come to the United States to visit Do Vole. She then moved in with the loved one of another inmate, and spent her time visiting Do Vole at the MDC until her arrest. This was not typical conduct for a manager in an international drug smuggling ring.

The government does not contend otherwise, except to say that it's "possible" that the defendant went to work at Tamanaco Dry Cleaners and then commandeered Do Vole to become her subordinate in a drug dealing operation. Tr. 5. There is no support for this cynical speculation, a deficiency made more notable by the fact that all of the couriers except Do Vole provided information to the government. In short, no facts have been brought to my attention that warrant the conclusion that defendant was as culpable, let alone more culpable, than Do Vole and the couriers. It is difficult to understand the government's insistence that the defendant spend at least seven and one-half more years in prison than Do Vole.

The government contends that the ground for departure in this case "in effect deprives the government of the exclusive authority granted it to move for a departure under U.S.S.G. § 5K1.1." The argument is premised on the belief that the Court "accord[ed] Gonzalez–Bello the departure that it assumed she would have received" had she cooperated. Rule 35(c) Motion at 2. This premise is incorrect. If Gonzalez–Bello had cooperated successfully, and the government had filed a motion permitting me to sentence below the guidelines and the five-year mandatory minimum, the sentence would have been substantially less than 63 months. In any event, the argument that downwardly departing to benefit Gonzalez–Bello deprives the government of its monopoly on rewarding cooperation is grossly overstated. It simply ignores the exceptional features of this case.

The government asserts that "the Court found an alternative basis for departure, a disparity between Gonzalez–Bello's sentence and that of her co-conspirator, Jose Do Vole." It then contends, citing *United States v. Joyner*, 924 F.2d 454, 461 (2d Cir.1991), that disparity in sentencing is not a permissible basis for departure. Rule 35(c) Motion at 2. This argument has no merit because the page of the sentencing transcript it relies upon makes clear that Do Vole's sentence was not an alternative basis for departure, but rather was a consideration "[i]n determining *how far* to depart." Tr. 36 (emphasis added); *see also id.* ("the *degree of my de-*

*parture* is influenced by ... the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of a similar conduct").

I stated explicitly that Bogan's affirmative obstruction of the defendant's opportunity to cooperate was my reason for departing. Having chosen to depart for that reason, the sentence of Do Vole was an appropriate barometer. Both were low-level members of the conspiracy, and he received a 60–month sentence after pleading guilty without cooperating.

### CONCLUSION

■ The Sentencing Guidelines are controversial. They have vested in the United States Sentencing Commission the authority to calibrate federal sentences based on a wide range of aggravating and mitigating circumstances. The Commission has erected a complicated apparatus that includes 43 levels and "insists on incremental punishment for every measurable aspect of offense conduct." Jon O. Newman, "The New Commission's Opportunity," 8 Federal Sentencing Reporter 8 (1995). Because the Commission operates at a distance from individual cases, there is an inevitable clumsiness in its guidelines. Even with all their complexity, the guidelines do not and can not account for all the factors, and combinations of factors, that are properly considered in sentencing. The departure mechanism acknowledges this.

■ A responsible application of the guidelines requires that the departure mechanism be used sparingly. Based on its superior "vantage point and day-to-day experience in criminal sentencing," the district court, "after a refined assessment of the many facts bearing on the outcome," should depart only if it concludes that the case is "unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon,* 518 U.S. at 98, 116 S.Ct. 2035.

For the reasons set forth above, this is such a case. Accordingly, the government's motion is denied.

So Ordered.