**UNITED STATES of America,**
**Plaintiff,**

v.

**Jaime DURAN–BENITEZ, Defendant.**

**Criminal Action No. 97–CR–974 (DGT).**

United States District Court,
E.D. New York.

Aug. 30, 2000.

Loretta E. Lynch, U.S. Attorney, Eastern District of New York by Eric Tirschwell, Brooklyn, NY, for Plaintiff.

Peter E. Quijano, Carro, Velez, Carro & Mitchell, LLP, New York City, For Defendant.

John Jacob Rieck, Jr., Doar Devorkin & Rieck, New York City, for Blossner.

## CORRECTED OPINION

TRAGER, District Judge.

Defendant Jaime Duran–Benitez ("Duran") was arrested on September 16, 1997, along with a co-defendant Ivonne Rodas–Bustamante ("Rodas") and her sister, Mayerlin Valencia–Bustamante. These arrests were made after "surveillance [led] to the discovery of, inter alia, $35,000 in a leather knapsack being carried by [Duran], drug records in the possession of [Rodas] and 130 grams of heroin and additional drug ledgers in a common residence." (Gov.'s Mem. Opp'n Def.'s Mot. Downward Departure at 2 [hereinafter Gov.'s Opp'n].) Duran and Rodas were arraigned on September 17, 1997. At that time Legal Aid Society attorney Heidi Poreda ("Poreda") was appointed to represent Duran, and Frank Handleman was appointed under the Criminal Justice Act, 18 U.S.C. § 3006A, to represent Rodas. One month later, on October 16, 1997, Duran and Rodas were indicted on two counts of possession of heroin with the intent to distribute and one count of conspiracy to distribute heroin, *see* 21 U.S.C. § 841(a)(1), (b)(1)(B)(i); *id.* § 846. The complaint and case against Valencia–Bustamante was dismissed on October 17, 1997.

In November of 1997, the Government sent an initial proposed plea agreement to Duran based on what it believed at the time was his degree of criminal culpability. (*See* Def.'s Ex. G–1.) This plea agreement estimated a range of imprisonment of 70–87 months. (*See id.*) By December, Duran, who had not agreed to plead guilty, was represented by a new, private attorney, Robert Blossner, Esq. ("Blossner").

(*See* Notice of Appearance filed Dec. 15, 1997.)

Beginning in December, Rodas began cooperating with the Government and revealed her and Duran's involvement in a large Colombian heroin trafficking network. Based on the information Rodas provided, Duran was implicated in "the importation, possession, and distribution of over 20 kilograms of heroin" from April 1996 until his arrest in September 1997. (Def.'s Ex. H at 2 (Letter from AUSA Eric Tirschwell to Robert Blossner, Esq. of 1/23/98)). This new information almost doubled the estimated range of Duran's incarceration and placed it between 135–168 months. (*See id.*) Additionally, Rodas's testimony, along with the testimony of other cooperators, helped convict Osvaldo "Danny" Rosa ("Rosa"), the purchaser of most of· the heroin Rodas ʼand Duran brought into the United States, in a case brought in the Middle District of Florida. *See United States v. Osvaldo Rosa et al.*, No. 98–69–CR–ORL–18(GKS) (M.D.Fla. 1998) (docket sheet).

Rodas's cooperation eventually earned her a " § 5K1.1 letter," *see* U.S. Sentencing Guidelines ("USSG") Manual § 5K1.1 (1998), from the Government and a significant downward departure at her sentencing. *See United States v. Duran–Benitez et al.*, No. 97–CR–974–2(DGT) (E.D.N.Y. Feb. 1, 2000) (order sentencing Rodas to time served and five (5) years supervised release). In contrast, Duran, who pled guilty in November of 1998 and is currently awaiting sentence, has not received a § 5K1.1 letter from the Government, be-

cause the information he sought to provide in April of 1998 was deemed stale.

In the instant motion, made on March 16, 1999 in response to a Presentence Report that estimated Duran's imprisonment range at 188–235 months, Duran seeks a significant downward departure under § 5K2.0 of the USSG on the ground that Blossner had an actual conflict of interest due to Blossner's past representation of Rosa and the fact that Rosa paid Blossner's fee to represent Duran. Duran claims his understanding of cooperation was stunted in the care of his conflicted attorney, and he was prevented from approaching the Government at a time when his information would not have been stale.

A hearing on Duran's motion was held on September 8, 9, and 13, 1999.[1] In addition to counsel for Duran and counsel for the Government, Blossner was represented by an attorney who was present throughout the hearing, was permitted to participate in the questioning of witnesses,[2] (*see* Tr. at 2–7), and was given the opportunity to recall Blossner at the end of the hearing, which he declined, (*see* Tr. at 511). The hearing was followed by written submissions from Duran and from the Government.

## Background

### (1)

### Blossner's Conflict of Interest

As noted above, Poreda was appointed Duran's counsel at his arraignment on September 17, 1997. (*See* Tr. at 318.) At that time, Poreda simply explained to Duran the charges pending against him, (*see*

---

1. The transcript of these proceedings will be cited "Tr. at (pg.# )" and the exhibits cited as "Def.'s/Gov.'s Ex. (# )." When appropriate, the testifying witness will be designated by last name.

2. To be more precise, over defense counsel's objection, Blossner's attorney was permitted to confer with the Government, after the Government concluded its cross-examination of a witness, and request that additional questions be asked. (*See* Tr. at 6.) If the Government refused to ask a question, counsel for Bloss-

ner could request that the Court ask the question. (*See id.*) As the hearing progressed, Blossner's counsel was, in fact, given the opportunity to pose questions to witnesses, (*see*, *e.g.*, Tr. at 154, 208, 316, 388, 451, 507), and the Government did, in fact, ask additional questions of some of the witnesses at the request of Blossner's counsel, (*see* Tr. at 253, 278–80). Moreover, on one occasion Blossner's counsel was permitted to directly question a witness. (*See* Tr. at 254–55.)

Tr. at 453), and promised to visit him at the Metropolitan Detention Center in Brooklyn ("MDC Brooklyn"), where he was being held, (*see* Tr. at 453–54).

### A. *Duran's Initial Meeting with Blossner*

Duran and Rodas both testified that thirteen days after their arraignment (September 30, 1997), they were called down to the visitor's room at MDC Brooklyn. (*See* Tr. at 10, 185, 467.) Two private attorneys, Blossner and David Segal ("Segal"),[3] and an interpreter were waiting to meet with them. (*See* Tr. 10, 185, 467–68; Def.'s Ex. C–1.) These visitors were unexpected; both Duran and Rodas testified that they had not directly contacted, nor asked anyone else to contact, private attorneys on their behalf. (*See* Tr. at 185–86, 467.)

This account of how Blossner came to visit Duran and Rodas is consistent with Blossner's testimony at the hearing, but differs from a statement Blossner made to this court during a conference addressing Duran's request to change counsel. (*See* Def.'s Ex. D (Transcript of conference held March 17, 1998).) During that conference, Blossner said that he became involved in Duran's case after Duran himself contacted Blossner and said he wanted Blossner to be his attorney. (*Id.* at 2–3.) But at the hearing, Blossner testified that he initially visited Duran and Rodas because Rosa had told him that one of his (Rosa's) friends had been arrested on federal drug charges and wanted private counsel for himself and his girlfriend, who had also been arrested. (*See* Tr. at 11–12, 17.)[4]

At the beginning of their first meeting, Blossner introduced himself to Duran and told him "I'm here on behalf of your friend in New York." (*See* Duran Tr. at 468.) When Duran inquired if this "New York friend" was Rosa, Blossner said that it was. (*See id.; see also* Blossner Tr. at 34 ("I introduced myself [to Duran] by my name and that I was recommended in one way or another by his friend Danny [Rosa].").) Blossner similarly introduced himself to Rodas and explained that Rosa had sent him. (*See* Tr. at 14, 185.) Rodas became convinced that Rosa had sent Blossner once Blossner told her that Rosa said she made "the best beefsteaks in New York." (Rodas Tr. at 185. *But see* Blossner Tr. at 14 (not recalling any comments made to Rodas about beefsteak).) Blossner then introduced Rodas to Segal, and these latter two went into a private cubicle to talk,[5] (*see* Tr. at 14, 187), while Duran, Blossner, and Schoen entered another cubicle, (*see* Tr. at 468).

---

3. Segal is a criminal defense attorney who shares office space with Blossner. (*See* Tr. at 10.)

4. Rosa knew Blossner had experience in federal criminal cases since Blossner had represented Rosa earlier that summer in connection with Rosa's violation of a supervised release term arising from a previous federal narcotics conviction. (*See* Tr. at 16; 400–04.) Blossner explained to Rosa that he would not be able to represent both the friend (Duran) and the friend's girlfriend (Rodas), but he could speak with one of them. (*See* Tr. at 17.) He also asked Rosa if his friend was "in a position to pay a fee," (*id.*), to which Rosa answered "yes," (*id.*).

Rosa's account, *see infra* Background § (1)B.4, accords with Blossner's inasmuch as Rosa testified to contacting Blossner and asking him to visit Duran. (*See* Tr. at 410–

11.) However, Rosa added that he contacted Blossner only after Duran requested Rosa's assistance in finding a lawyer. (*See id.*)

5. Rodas testified that as soon as she found out Rosa had sent Blossner and Segal, she knew she could not "explain to [them] the reason why [she and Duran] had been arrested. [She] knew that wasn't good for [her]." (Tr. at 188.) She said: "I [could not] accept that the man I had sold drugs to [would] be the one to pay for my attorney." (*Id.*) Thus, she did not retain Segal during or after their initial meeting. (*See* Tr. at 187, 197.) Instead, Rodas continued to be represented by her CJA attorney until December 1997, when she retained Robert Weinstein, Esq., an attorney recommended by fellow inmates and paid for with money from her family. (*See* Tr. at 189.)

Blossner and Duran testified to slightly different versions of what occurred at this first meeting, although they agreed on the following details: First, Blossner told Duran about his thirty years of experience as a criminal defense attorney, particularly his expertise at trial. (*See* Tr. at 468.) Second, Duran and Blossner discussed, in general terms, the money laundering charges for which Duran was arrested. (*See* Tr. at 72, 469.) Third, Blossner quoted Duran a fee of $25,000 to accept his case. (*See id.*) Duran replied that he was not sure how he could pay that high a fee, but that he would try to get the money from his family in Colombia. (*See id.*) Fourth, Blossner warned Duran not to discuss his case with other inmates at MDC Brooklyn. (*See* Tr. at 38, 468.)

Finally, on the subject of cooperation, both witnesses agree that Blossner did not explain the concept or the process to Duran during this first meeting. (*See* Tr. at 34, 37, 468–69.) Instead, Blossner concedes that he mentioned cooperation only in the context of warning Duran that it could be dangerous to speak with other inmates about his case, (*see* Tr. at 38), and by generally describing Duran's three options as "going to trial, going forward with motions, or pleading. In [Blossner's] mind, pleading contain[ed] cooperation." (Blossner Tr. at 36.) Duran, however, remembered Blossner negatively commenting on cooperation by telling him that most of the people in the visiting room were "the snitches, the rats," (Duran Tr. at 469), and that "they [were] going to end up worse than the problem they were in," (*id.*).

## B. *Subsequent Meetings with Blossner*

After their first meeting at the end of September 1997, Blossner visited Duran at MDC Brooklyn five to seven more times before he was retained as Duran's counsel in December of that same year. (*See*

Blossner Tr. at 44. *But see* Duran Tr. at 470 (estimating eight to ten visits with Blossner from September through December 1997).) [6] Different witnesses provided different versions of why Blossner continued to meet with Duran during this time and who eventually paid his retainer.

### 1. *Blossner's Testimony*

Blossner testified that a few weeks after their initial meeting, a friend of Duran's, Jackie Campo ("Campo"), began to call him to ask him to visit Duran and accept Duran's case. (*See* Tr. at 43.) Campo also visited Blossner's office several times. (*See* Tr. at 78.) The first time she visited the office, she explained to Blossner that she was a friend of Duran's, that Duran had asked her to help him, and that she wanted to know what she could do. (*See* Tr. at 78–79.) Blossner did not discuss Duran's case with Campo during that first visit. (*See* Tr. at 79.) However, during a subsequent visit with Duran at MDC Brooklyn, Duran gave Blossner permission to talk with Campo about his case. (*See id.*) Duran also told Blossner that Campo was a good friend and was helping him make three-way calls to his family in Colombia in an attempt to raise the money to pay Blossner's fee. (*See id.*)

Thereafter, Campo continued to call Blossner regularly, asking him to represent Duran and reassuring him that Duran was attempting to raise the money needed to retain him. (*See* Tr. at 80, 82.) On one occasion, Blossner recalled Campo, Rosa, and another woman meeting at his office and trying to convince him to become Duran's attorney. (*See* Tr. at 43.) After discussing the "viable issues" of Duran's case with the trio, Blossner emphasized his need to receive payment, and Campo again assured him that Duran was trying to raise the money to pay him. (*See* Tr. at 82.) Blossner was certain that although he discussed Duran's case with both Cam-

---

6. The exact number of times Blossner met with Duran could not be determined because the records obtained from MDC Brooklyn were incomplete. (*See* Tr. at 349; Def.'s Exs. C–C–7.)

po and Rosa at various times during the fall and winter of 1997, he never discussed whether or not Duran was cooperating. (*Id.*)

Blossner further testified that in early December 1997, Rosa inquired whether Blossner was representing Duran. (*See* Tr. at 43.) Blossner answered: "No, he [ ] never retained me. I haven't seen him in a while and I'm not going to see him again." (Tr. at 85.) In response, Rosa offered to pay Blossner's fee on Duran's behalf, stating his belief that Duran would pay him back. (Tr. at 86.) After negotiating a reduction in the fee ($15,000 if there was no trial; $25,000 if a trial took place), Blossner agreed to allow Rosa to pay him to be Duran's attorney. (*See* Tr. at 87.) Rosa returned later that night or the next day and gave Blossner $8,000 in cash.[7] (*Id.*) According to Blossner, an additional fee of $7,000 was paid to him by Rosa sometime in late December 1997 or early January 1998. (*See* Tr. at 102.) Rosa explained to Blossner that the balance of the fee had not been paid sooner because the money was "slow in coming to him [ (Rosa) ] from [Duran's] family." (Blossner Tr. at 101.)

Soon after the first installment of his fee had been paid, Blossner visited Duran at MDC Brooklyn and told him Rosa had paid his retainer. (*See* Blossner Tr. at 89.) Duran responded by questioning Blossner about how much the representation was going to cost—$40,000 or $25,000. (*See id.*) Once Blossner assured Duran that his fee was $25,000, (*see id.*), Duran asked if Blossner's total fee had been paid, (*see* Tr. at 90). When Blossner answered no, Duran "informed [him] that [he] didn't have to worry, that his family was going to make sure [he] was paid the whole thing." (*Id.*) Blossner maintained that even though the money came from Rosa's hand, Blossner was "very, very clear that [Duran] was responsible for the payment of [his] fee." (*Id.*)[8]

Blossner admitted that at no time before or after accepting payment from Rosa did he inquire as to the nature of the relationship between Rosa and Duran or whether there was any illegal business between the two. (*See* Tr. at 17–18, 32–33, 175–76.) Blossner also testified that during their various conversations about the fee and the case, Rosa never gave him any indication that he and Duran were involved in a drug trafficking network together, (*see* Tr. at 69), nor that he had any involvement in the criminal activity for which Duran was arrested, (*see* Tr. at 175–76).

### 2. Duran's Testimony

After Blossner's first visit, Duran, with the help of Campo, placed many phone calls to Colombia to try to raise the funds needed to pay Blossner's fee. (*See* Tr. at 488.) However, these fund-raising attempts were unsuccessful. (*See id.*) At the same time (approximately three weeks after Blossner's first visit), Rosa arranged to speak with Duran on the telephone. (*See* Tr. at 465–66). Duran testified that Rosa asked him to provide the phone numbers of his drug suppliers in Colombia, which Duran refused to do. (*See* Tr. at 467, 489.) Duran asked Rosa to repay him

---

**7.** Blossner produced two bank deposit receipts, each for $4,000, dated December 11, 1997. (*See* Tr. at 88.)

**8.** This statement is somewhat contradictory of a statement Blossner previously made to this court during a conference addressing Duran's request to change counsel. (*See* Def.'s Ex. D.) At that conference, after being ordered to disclose who paid his fee, (*see* Def.'s Ex. D at 6–7), Blossner answered, "[a] former client of mine paid the fee, your Honor, and my client's name is Osvaldo Rosa." (*Id.* at 7.) At

the hearing, Blossner explained this inconsistency by stating:

> Osvaldo Rosa is the one that put the money in my hand. To my belief, to my knowledge, Osvaldo Rosa was going to be reimbursed by the defendant. The defendant reinforced that belief in me when I went to see him. That's what I meant when I said that Mr. Rosa paid the fee. If I was inarticulate [at the March conference], that's what I meant.

(Tr. at 91.)

$9,000 he was owed from a previous drug transaction, (*see* Tr. at 466), so that Duran could use the money to hire Blossner, (*see* Tr. at 488). Rosa agreed to do so and told Duran he "was in good hands" with Blossner and that he should "trust the attorney he [ (Rosa) ] had sent." (Tr. at 467.) Duran also asked Campo to continue reassuring Blossner that he was trying to raise the money to pay his retainer and to ask Blossner to keep visiting him at MDC Brooklyn. (*See* Tr. at 489.)

Duran further testified that during a visit which took place in the middle of December 1997, Blossner informed him that his "fee ha[d] been taken care of." (*Id.*) When Duran inquired how much the fee was and whether Danny had paid it, Blossner answered that the fee was $25,000 and that "your friend [ (meaning Danny) ] had taken care of it." (Tr. at 490.) [9] Duran also recalled that sometime in the end of January 1998, he discovered that the money Rosa used to pay Blossner did not come from his family, as he had originally believed, but came from Duran's Colombian drug suppliers. (*See* Tr. at 500–01.) Duran believed that both his family and Rosa contacted the Colombians and asked them to pay Blossner's fee, (*see* Tr. at 502), and that the Colombians agreed to do so in order to discover whether Duran was cooperating, (*see* Tr. at 501, 503).

### 3. Campo's Testimony

Campo testified that her first visit with Duran after his arrest took place during the first two weeks of October 1997. (*See* Tr. at 262.) During this visit, or soon thereafter, Duran asked Campo to "visit [Blossner] as a member of the family, as a representative, to keep up-to-date on what was happening, and to formulate an opinion ... whether or not he was a good attorney." (Tr. at 263–64.) Campo

agreed to do so, and between mid-October and December 1997, she made numerous telephone calls to Blossner and visited his office on seven or eight occasions. (*See* Tr. at 265–66.) She also facilitated three-way phone calls to Colombia so that Duran could speak with his family, (*see* Tr. at 271), although she did not remember whether Duran told her he needed to make these calls to try to raise money to pay Blossner's fee, (*see* Tr. at 272).

Campo claimed to have consulted with Blossner about everything she was doing to assist Duran, including making the three-way phone calls to Colombia. (*See* Tr. at 278.) While she believed that she once asked Blossner not to abandon Duran, she did not remember telling him that Duran was trying to raise the money to pay his fee. (*See* Tr. at 269.) Instead, she said it was "assumed that the attorney would be paid [for] by Danny [Rosa]," with money he owed Duran. (Tr. at 272.) She also insisted that she never gave Blossner or Rosa any money to be applied to Duran's legal fees. (*See* Tr. at 268.)

In mid-October 1997, (*see* Tr. at 264), during Campo's first (or possibly second) visit to Blossner's office, she met Rosa for the first time. (*See* Tr. at 265.) They met coincidentally in the lobby of Blossner's building and rode the elevator up to his office together. (*See* Tr. at 266.) Rosa asked Campo to tell Duran "not to worry, that he was going to help him out with the attorney, he would not abandon him and that he had a good attorney and that he [Rosa] would take charge of it." (Campo Tr. at 266–67.) Rosa also told Campo that he was going to pay Blossner's fee. (*See* Tr. at 265.) During this meeting, and at least two others Campo recalled, Rosa, Blossner, and she discussed how Duran's case was going and what could be done to help him. (*See* Tr. at 267–68.) Additionally, before or after these meetings, Campo

---

9. This testimony contradicts an earlier statement made by Duran in which he claimed he only "assumed that 'Danny' [Rosa] must have paid [Blossner's] fee." (*See* Aff. of Jaime Duran–Benitez ¶ 15 [hereinafter Duran Aff.].) Nowhere in his affidavit does Duran state that Blossner actually confirmed that Rosa had paid him. *See id. passim.*

would be asked to wait outside the office to allow Rosa and Blossner to speak privately together. (*See* Tr. at 268.)

Although she was never explicitly told, Campo "supposed" that Duran and Rosa had worked together in the drug business, a conclusion Duran "led [her] to believe." (Tr. at 276.) She also concluded that Blossner was aware of the illegal partnership between Duran and Rosa based on the fact that Blossner and Rosa were "very friendly" and because Rosa had agreed to help pay Duran's fee. (*See* Tr. at 277.) Moreover, Campo recalled that during one meeting, Rosa and Blossner discussed how the money to pay Blossner's fee could be "channeled to him in a legal fashion." (Tr. at 273.) One option they explored was making the money appear to have come from Colombia, (*see* Tr. at 274), instead of from Rosa, due to Rosa's involvement with illegal drugs, (*see* Tr. at 275–76).

### 4.  *Osvaldo "Danny" Rosa*

According to Rosa, Campo and another friend of Duran's called him a week or two after Duran had been arrested to collect some money he owed Duran. (*See* Tr. at 409.) The next day, Rosa went over to Campo's apartment to deliver the money owed—between $10,000 and $15,000. (*See* Tr. at 410.) When he arrived, Duran was on the phone, and Rosa agreed to speak with him. (*See id.*) Rosa claimed that during this phone conversation Duran asked for his help in finding an attorney and, in response to Duran's request, Rosa contacted Blossner about Duran's case. (*See* Tr. at 411.)

Shortly thereafter, Rosa met Campo and another friend of Duran at Blossner's office for a meeting they had scheduled. (*See* Tr. at 411.) After Rosa introduced the women to Blossner, he claims to have left the room to talk with Blossner's secretary and paralegal and with Segal, the

attorney who shares office space with Blossner. (*See* Tr. at 412, 434.) When Rosa returned to Blossner's office, Blossner indicated he had agreed to look into Duran's case. (*See id.*). Rosa also noticed a stack of money on Blossner's desk, which he assumed was from Campo to be applied to Duran's legal fee. (*See* Tr. at 414, 434). Rosa denied ever negotiating a fee with Blossner for his representation of Duran, (*see* Tr. at 436), denied directly paying Blossner a fee to represent Duran, (*see* Tr. at 413), and denied ever discussing Duran's case with Blossner and Campo, (*see* Tr. at 436). Rosa also maintained that he never told Blossner he had regularly purchased heroin from Duran. (*See* Tr. at 416).

### C.  *Blossner's Representation of Rosa's Couriers*

Throughout his testimony, Blossner adamantly maintained that he was unaware of any illegal connection between Rosa and Duran until after he was relieved as counsel in March of 1998. (*See, e.g.,* Tr. at 17–18, 69, 175–76.) His credibility on this issue, however, was seriously undermined by the testimony of both Duran and Campo, who indicated Blossner knew Duran and Rosa were engaged in illegal activities together, as well as the testimony of three other associates of Rosa who were arrested on narcotics charges in late 1997 and early 1998 and to whom Blossner also provided legal advice. These three witnesses described Blossner's behavior in a manner almost completely consistent with Duran's descriptions,[10] and their testimony provides convincing evidence that Blossner engaged in a pattern of representation designed to protect the interests of Rosa, his former client.

Sehring and Rodriguez agreed to become drug couriers for Rosa when he recruited them in a Manhattan nightclub in 1997. (*See* Tr. at 216, 285.) Upon arriv-

---

10.  Although one of these witnesses, Carlos Garces ("Garces"), admitted to knowing Duran, (*see* Tr. at 362), Holly Sehring ("Sehr-ing") and Cynthia Rodriguez ("Rodriguez") did not know and had never met or spoken with Duran, (*see* Tr. at 213, 282).

ing in Miami International Airport from Colombia on the evening of December 24, 1997, they were arrested for attempting to import heroin into the United States. (See Tr. 214, 282–83.) The next day (December 25, 1997), when Sehring and Rodriguez were brought up for their arraignment, Blossner and another attorney, Manuel Vasquez, were waiting to represent them. (*See* Tr. at 219, 287.)[11] Here, too, the appearance of the attorneys was unexpected, because the women had been brought to jail so late the night before, neither had the opportunity to make any phone calls or attempt to arrange for counsel. (*See id.*) According to Sehring, Blossner introduced himself and explained that while he was on vacation in Florida, a friend of hers had called him, told him she had been arrested and asked him to help her out. (*See* Tr. at 220.) Sehring claimed to have known right away that Rosa had sent Blossner because "[Rosa] was the only person that would have been obligated to." (*Id.*) Similarly, Rodriguez realized Rosa must have contacted the attorneys when Blossner told her: " 'You know who sent us. There [are] people out there who love you.' " (Rodriguez Tr. at 288.) While Sehring claimed that Blossner told her to say that her family was paying his fee, (*see* Tr. at 251), no money was ever paid to either attorney by Sehring or Rodriguez or their families; instead, Rosa paid the attorney's fees for both. (*See* Tr. at 233, 290.)

Both witnesses admitted to initially not wanting to cooperate against Rosa, (*see* Tr. at 224, 303), but they also both testified that Blossner never explained cooperation to them, (*see* Tr. at 224, 295), and only mentioned it as an option he did not recommend, (*see* Tr. at 222, 296). He also told Sehring that the Government was not interested in her cooperation. (*See* Tr. at 223; *see also infra* note 20.) Instead, Blossner advised both women that safety-valve proffers would be the best course for

them to pursue, (*see* Tr. at 221, 292), even though he was aware Rodriguez had a prior felony conviction which would make her ineligible, (*see* Tr. at 306). According to the women, Blossner made this recommendation without asking either of them for any details regarding the crime for which they were arrested. (*See* Tr. at 298; *cf.* Tr. at 226.) In fact, Sehring testified that when she agreed to draft a safety-valve proffer, Blossner specifically told her to not include names and not get into too much detail, (*see* Tr. at 226–27; *see also* Gov.'s Ex. at HS–1). After reviewing her first draft which did not include any names at all, (*see* Gov.'s Ex. HS–1), Blossner characterized the narrative as "excellent" and praised Sehring for "cover[ing] everything important on [her] 1st try." (Gov.'s Ex. HS–3.)

In March of 1998, however, Blossner instructed Sehring to add more names to her statement to make it more detailed. (*See* Tr. at 234.) Sehring complied, but in the section of her narrative in which she recounted how she and Rodriguez were recruited, she gave the name of the person they met in the Manhattan nightclub as "Jeffrey," not "Danny" (Rosa). (*See* Gov.'s Ex. HS–4.) At the hearing in this case, Sehring asserted her Fifth Amendment right against self-incrimination when questioned about why she did not use Rosa's name in the letter. (*See* Tr. at 235–36). However, Sehring did explain that she was sure the letter would be shown to Rosa, since Rosa told her he had seen a copy of the first draft of the letter, as well as her lab results. (*See* Tr. at 231, 237). After reviewing this second draft of the letter, Blossner told Sehring it was fine and forwarded it to the Government. (*See* Tr. at 249–50.) Soon thereafter (April 15, 1998), Sehring received a letter from Blossner explaining that he could no longer represent her because he had been notified of a conflict of interest caused by his previous representation of Osvaldo Rosa, who Sehr-

---

**11.** Although formally represented by Vasquez, Rodriguez testified that most of the times she

met with Vasquez, Blossner was present and did most of the talking. (*See* Tr. at 294.)

ing knew only as "Danny." (*See* Tr. at 239; Gov.'s Ex. HS–5.)

After another attorney was appointed to represent Sehring, she decided to cooperate, testified against Rosa, and was ultimately sentenced to 38 months in prison, half the sentence she would have received if she had not cooperated. (*See* Tr. at 236.) Similarly, once Blossner was no longer involved in Rodriguez's case, she convinced Vasquez to make her an appointment with the Government, (*see* Tr. at 299–300), and, after testifying against Rosa, she was sentenced to 48 months in prison, (*see* Tr. at 302).

The story related by Garces about his brief interaction with Blossner in early 1998 echoes the accounts of Sehring and Rodriguez. First, although Blossner had previously represented Garces in a state court violation-of-probation matter, (*see* Tr. at 366–67), Blossner "just appeared" to represent Garces on March 2, 1998, the day after Garces was arrested on federal drug charges. (*See* Tr. at 363, 368, 370.) Second, Garces assumed that Rosa had sent Blossner to represent him, (*see* Tr. at 369, 382), since Garces had not called Blossner or anyone else regarding representation, (*see* Tr. at 368, 382), and since Garces knew Blossner was "Danny's lawyer too," (Tr. at 369). Third, while their attorney/client relationship was short-lived—Blossner recused himself in April of 1998—Garces never paid Blossner a fee for representing him. (*See* Tr. at 371.) Additionally, Garces admitted that Blossner asked Garces to tell the authorities an untruthful story Blossner had received from Rosa. (*See* Tr. at 377–80.)

## D. *Analysis and Findings*

The testimony summarized above reveals several important facts central to an understanding of how Blossner came to represent Duran, who eventually paid Blossner's fee, and, more importantly, his awareness of Rosa's involvement in Duran's drug dealing.

### 1. *How was Blossner retained and who paid his fee?*

All the witnesses agree that Blossner became involved in Duran's case at Rosa's request and recommendation, although whether Rosa was prompted by Duran asking for his assistance in finding a lawyer was hotly disputed. Additionally, of the $15,000 Blossner was eventually paid by Rosa to represent Duran in the instant case, only $9,000 came from the unpaid debt Rosa owed Duran. While it is unclear whether the remaining $6,000 was paid by Duran's Colombian connections or out of Rosa's own pocket, it is more likely the latter. Rosa denied paying Blossner any money for his representation of Duran, but his testimony is suspect. It is not only contradicted by Campo and Duran, but by Blossner's own account of Rosa paying him $8,000 in early December 1997, (*see* Tr. at 86–87), and another $7,000 later that same month, (*see* Tr. at 102), to cover Duran's attorney's fee.

### 2. *What did Blossner know about Duran's relationship with Rosa?*

Although the source of the payment of Duran's fee is significant, as is Blossner's knowledge of that source, more relevant is the question of Blossner's knowledge of Rosa's involvement in Duran's drug dealings.

The evidence of Rosa's prior dealings with Blossner helps to illuminate this latter issue. Both Rosa and Blossner admitted that Rosa paid Blossner and Vasquez to represent Rodriguez and Sehring, two of Rosa's drug couriers who were arrested a few months after Duran. (*See* Blossner Tr. at 22, 108, 109–11; Rosa Tr. at 439.) Although there was conflicting testimony about the total amount of the fee paid—$15,000, (*see* Blossner Tr. at 110), or $40,-000, (*see* Rosa Tr. at 441)—and where payment of the fee was made—at a synagogue, (*see* Rosa Tr. at 439), on the street while dog-walking, (*see* Blossner Tr. at 111), or left on the floor of a car, (*see* Rosa

Tr. at 441)—what was clear was that Rosa financed Blossner's defense of these couriers, even though Rosa was implicated in the charges brought against them.

Blossner denied all wrongdoing with regard to his former clients, as well as with regard to Duran. (*See* Blossner Tr. *passim.*) However, the other witnesses' accounts of Blossner's representation and the professional advice he consistently gave are so strikingly similar to what he advised Duran that I must conclude that Blossner regularly accepted payment from Rosa to represent members of his drug distribution network in order to ensure that Rosa was not implicated in their illegal activities.

Further, Blossner agreed to represent Duran after admittedly receiving payment from Rosa, even though Blossner did not inquire about any possible illegal connection between Rosa and Duran. (*See* Blossner Tr. at 17–18, 32–33, 175–76.) Instead, according to his own testimony, he deliberately avoided making inquiry. (*See id.*) Based on Blossner's own testimony regarding his prior and continuing dealings with Rosa, however, Blossner, at a minimum, must have suspected Rosa had some illegal dealings with Duran but failed to follow up on that suspicion. This circumstantial evidence, as well as Blossner's direct testimony, make it abundantly clear that at a minimum Blossner suspected and more likely than not knew (from Rosa) that Rosa was criminally involved in Duran's case. It follows that Blossner's testimony was false when he denied having any idea that Duran and Rosa had a criminal connection. (*See* Blossner Tr. at 18.)

### (2)

### Cooperation

Central to Duran's request for a downward departure is his claim that no one ever fully explained the benefits of cooperation to him. He maintains that if he had been told soon after his arrest that cooperation could ultimately reduce his sentence, he would have immediately cooperated and provided useful information to the Government. (*See* Tr. at 483.) The testimony received at the hearing addressing this issue, however, does not completely support Duran's claim.

### A. *Duran's Discussions with Poreda*

On October 3, 1997, three days after Duran first met with Blossner, Poreda, the Legal Aid attorney, met with Duran at MDC Brooklyn. (*See* Tr. at 321, 326, 454.) During their hour-long conversation, Duran and Poreda discussed the Government's evidence—the money Duran was carrying when arrested and the heroin that was later found at his apartment. (*See* Tr. at 330, 454.) Duran admittedly lied to Poreda by denying the money he was carrying was drug money, (*see* Duran Tr. at 484–85), and claimed to be unaware of the heroin found in his house, (*see* Tr. at 483–84). They also discussed Duran's visa status and what was going to happen to his personal belongings. (*See* Tr. at 327, 454–55.) At the end of the conversation, Poreda informed Duran that she had scheduled a proffer session with the Government for him. (*See* Tr. at 322, 455, 485.) However, in light of their conversation, Poreda decided to postpone the session. (*See* Tr. at 329, 455.)

#### 1. *Poreda's Testimony Concerning Cooperation*

Poreda admitted that she did not explain to Duran in detail what cooperation in the federal system entailed during their October 3, 1997 meeting. (*See* Tr. at 334.)[12]

---

**12.** During the hearing, "explaining cooperation in detail" was generally defined as explaining to Duran that although cooperation would require disclose of any and all involvement with illegal narcotics he had or knew about (a disclosure which could potentially result in a higher offense level under USSG), the Government would reciprocate by agreeing to move for a downward departure at his sentencing under § 5K1.1, a motion which would likely reduce his sentence to a level

However, she did recall telling Duran that cooperation would only be fruitful if he was honest about any criminal conduct he was aware of, (*see* Tr. at 324; *see also* Duran Tr. at 456), and that "[i]f he cooperated and the cooperation was successful, he could expect to receive a much lower jail sentence," (Tr. at 336). Poreda also remembered that Duran seemed unsure about whether or not he wanted to cooperate, (*see* Tr. at 322), and that this hesitancy probably caused her to suggest cancelling the scheduled proffer session, (*see* Tr. at 325, 456). She also explained that if Duran had seemed hesitant about cooperation, she "might not have discussed the nature of cooperation in as [much] detail as [she otherwise] would have." (Tr. at 325.)

The notes Poreda took during her October interview with Duran confirm her independent recollections. Poreda wrote in her file: "Defendant not sure if he wants to cooperate;" "Defendant wants to know what happened to the co-defendant, the co-defendants, the girls;" and, under the heading "To Do," she wrote "Number 2. Cancel proffer. Defendant needs time to think about [it]." (Tr. at 328–29.) Her notes also reflect that she "probably did not give [Duran] a very detailed explanation of the way cooperation works in the federal system," (Tr. at 329), although she felt "confident in saying that [she] probably would have told him if he cooperated and the cooperation was successful, he could expect to receive a much lower jail sentence," (Tr. at 336).

This October meeting was the only time Poreda discussed cooperation with Duran. After this meeting, Poreda met with her client only one other time, at the district courthouse on November 13, 1997. (*See* Tr. at 331.) In the few minutes they had in the holding cell before entering the courtroom, Poreda discussed neither the proposed plea agreement sent to Duran on November 10 nor cooperation. (*See* Tr. at 332.) After the scheduled status conference was adjourned to allow plea negotia-

tions to continue, Duran told Poreda he wanted to hire a private attorney. (*See* Tr. at 333.) Accordingly, Poreda did not speak with Duran again and was officially relieved as counsel on December 16, 1997. (*See* Tr. at 318, 334.)

### 2. Duran's Testimony

Duran's testimony contradicts Poreda's with regard to what was said about cooperation during their initial meeting on October 3, 1997. Duran denied telling Poreda he needed time to think about whether he wanted to speak with the Government, (*see* Tr. at 485), and instead, claimed that Poreda independently decided that it was too early to take him to the scheduled proffer session, (*see id.*). Duran also denied that Poreda told him cooperation might help him get a lower sentence. (*See* Tr. at 487.) Similarly, he maintained that since cooperation was not explained to him in detail, he did not know what it was and, therefore, never said he did not want to do it. (*See* Tr. at 456.)

### 3. Analysis and Findings

Poreda's account of what occurred during her October meeting with Duran is more credible than Duran's. While Duran's obviously false denials of any involvement with illegal drugs provided Poreda with reason enough to cancel the proffer session, her written notes confirm that she at least explained in general terms the benefits of cooperation, (*see* Tr. at 328–29). Duran's testimony is also inconsistent with his admitted concerns about the safety of his family in Colombia if he chose to cooperate. (*See* Tr. at 492, 470, 507). These fears of retaliation alone more than adequately support Poreda's testimony that she informed Duran generally about the benefits of cooperation, but he was hesitant to go forward.

### B. Duran's Discussions with Blossner

### 1. Duran's Testimony

After Blossner's first visit to Duran at MDC Brooklyn in September 1997 and

---

· below what it would have been without cooperation. (*See* Tr. at 36–37, 325.)

before being retained in December of that year, Duran estimated that Blossner visited him eight to ten times. (*See* Tr. at 470; *see also supra* note 6.) Duran recalled that Blossner would usually begin these visits by asking Duran if he was ready to hire Blossner as his attorney. (*See id.*) After that, Blossner would tell Duran "stories" that often had concerned the perils of cooperating. (*See id.*) For example, Duran recalled one story Blossner told him about an informant who was killed after providing information to the police which led to the arrest of a thief. (*See* Tr. at 471.) Blossner told Duran that the man who killed the informant justified his actions by stating that "there should not be any rats in New York." (Duran Tr. at 471.)

During another visit, Blossner asked Duran if he was aware of the violent murders which often occurred in Colombia in retaliation for a defendant's choices in the context of a case in the United States. (*See* Tr. at 470.) Duran responded by assuring Blossner that he "knew quite well [what] the situation in Colombia [was]," knew it better even than Blossner did. (*Id.*) In fact, although Duran maintained that in the beginning he did not cooperate because he "didn't know what to do," (Tr. at 492), he also admitted he was always aware that cooperation could cause harm to befall him and/or his family in Colombia, (*id.*; Tr. at 470, 507).[13]

In addition to these "stories" focusing on the risks of cooperating, Duran claims that during these visits Blossner specifically told him cooperation was an option, but that it "wouldn't get [him] anywhere," (Tr. at 471), and that "the cure would be worse than the illness," (Tr. at 493).

In late November or early December 1997 (before Blossner was formally retained), Duran reviewed with Blossner the Government's first proposed plea agreement. (*See* Tr. at 472.) To Duran, "the offer ... was proof of the time [he] was facing," so he decided to "try[ ] to approach the government." (Tr. at 497.) To this end, he claims to have detailed his participation in the Colombian drug network for Blossner, including the fact that Rosa was his main "client," although he sometimes sold drugs to "the Dominicans" as well. (*Id.; see also* Tr. at 509.) Although Duran did not agree to plead guilty during this meeting, (*see* Tr. at 507), he did ask Blossner to take him to see the Government. (*See* Tr. at 473.) Duran testified that Blossner's initial reaction to this request was to warn Duran that talking about "many more kilos" could make things worse for him. (*See* Tr. at 473.) After Duran insisted, Blossner agreed to try to get a meeting with the Government. (*See id.*)

Duran explained that he asked Blossner instead of Poreda because he saw Blossner more frequently and because other inmates had led Duran to believe that "nothing was solved" by Legal Aid attorneys. (*See* Tr. at 498; 510.) However, in mid-December, Blossner reported to Duran that he was unable to set up a proffer session because the Government did not want to talk to Duran. (*See* Tr. at 497–98.)

After receiving this bad news from Blossner, Duran had occasion to speak with Rodas. January 7, 1998 was Duran's birthday, and when Rodas saw him, she called out through the bars to congratulate him. (*See* Tr. at 474; *see also* Rodas Tr. at 195.) When he approached her to talk, she told him she had already met with the Government[14] and then inquired what was happening with him. (*See* Tr. at 474–75.) Duran responded: "[M]y attorney definitely doesn't want to take me in. He tells me the government doesn't want to see me." (Tr. at 475.) After wishing Rodas "a lot of

---

13. Duran testified that both his family and Rodas's family were threatened in March or April of 1998, soon after Blossner stopped representing Duran. (*See* Tr. at 492, 508.)

14. Rodas's first meeting with the Government took place on December 17, 1997, at which time she signed a proffer agreement. (*See* Tr. at 206.)

luck," he reconfirmed his commitment to "go on insisting to see what it is I can do." (Tr. at 476; *see also* Rodas Tr. at 196.) Duran explained that this conversation with Rodas left him "fe[eling] like he was being left behind." (*See* Tr. at 476.)

That feeling was confirmed when Duran received the January 23, 1998 letter from the Government outlining new information about Duran's criminal culpability and estimating a much lengthier term of incarceration than predicted in the November 1997 proposed plea agreement. (*Compare* Def.'s Ex. H, *with* Def.'s Ex. G–1.) Duran claims to have originally reviewed this letter only with Schoen, the interpreter, but soon thereafter met with Blossner to discuss it. (*See* Tr. at 476; *see also* Schoen Tr. at 353.) Duran testified that he was "a bit upset" when he met with Blossner because he felt he could have told the Government all the additional information himself. (*See id.; see also* Tr. at 494 ("I was very offended because I had given [Blossner] that information....").) Duran demanded to know what was going to happen next. (*See* Tr. at 477.) Blossner responded by telling more "stories" or "parables," the point of which seemed to have been that there was nothing Blossner could do to fix Duran's situation.[15]

Dissatisfied with these parables, Duran claims to have again insisted that Blossner bring him to the Government. (*See* Tr. at 477.) When Blossner asked who Duran was planning to talk about, Duran mentioned the Dominicans, but not Rosa because "[b]y then [he] had realized that [Blossner] didn't want to do anything for [him]; that [Blossner] was doing things for Danny [Rosa], and he wouldn't take [Duran] in if [he] told [ ] something about Danny." (Tr. at 478.) Duran did not relate how Blossner responded to his January request to see the Government, but it

appears to have been the last time he and Blossner discussed cooperation before Blossner was relieved as counsel in March of 1998.

### 2. *Blossner's Testimony*

Blossner acknowledged that he did not discuss cooperation in detail with Duran during their first meeting, (*see* Tr. at 37; *supra* Background § (1)A), and testified that sometime soon after this initial conversation, Duran told him that "the Legal Aid attorney ... said the government wanted to speak with him [a]nd he had no desire for that," (Blossner Tr. at 35). Thus, since Blossner was visiting Duran "with the hope of being retained to be his attorney," (*id.*), Blossner decided it was not in his "best interests" to "immediately begin to embark upon cooperation when [Duran] didn't need him for that," (Tr. at 74). He also testified that because Duran was represented by other counsel, he did not "believe it was [his] position, at that time, to [discuss cooperation]." (Tr. at 73.)

Blossner further testified that he superficially addressed cooperation with Duran during the meetings that took place between late-September and mid-December 1997. (*See* Tr. at 40.) According to Blossner, these discussions focused on how cooperation gave Duran's fellow inmates incentive to betray Duran's trust and repeat to the prosecutor anything Duran told them about his criminal conduct. (*See id.*) Thus, Blossner advised Duran not to speak with anyone at MDC Brooklyn about his case because "many defendants try to get their potential sentence reduced by cooperating with the Government in return for a motion by the government to have their sentence reduced." (*Id.*) Blossner denied ever telling Duran any "stories" about how cooperation usually resulted in the cooper-

---

**15.** Duran recalled that Blossner told one story about a doctor who discovered during surgery that his patient's cancer was untreatable and decided the best thing to do was "just to sew him up again." (Tr. at 477.) Blossner also told Duran a story about a little boy who used

his finger to plug a hole he discovered in an Amsterdam dike. (*See id.*) Blossner explained that in Duran's situation there was not just one hole, but many and that "he [(Blossner)] didn't have enough fingers and toes to be able to close up all the holes." (*Id.*)

ator either receiving a more severe sentence or being physically injured. (*See* Tr. at 42.) [16]

Blossner also recalled discussing the November proposed plea agreement with Duran. (*See* Tr. at 27–28.) During a mid-November meeting, Duran asked Blossner if he could do better than the 70–87 months estimated in the proposed agreement. (*See* Tr. at 29, 31.) Blossner claims to have responded by cautioning Duran that if he began cooperating, he would have to be completely honest about every criminal activity he was involved in or knew about, because if the Government caught him in a lie, he would get a much more severe sentence than he was currently facing. (*See* Tr. at 46.) Blossner described this response as his "little bit pregnant speech, [intended to remind the defendant that] [t]here is no such thing as a little bit pregnant." (*Id.*) Blossner denied telling Duran that cooperation would only make things worse. (*See* Tr. at 46–47). Blossner also denied Duran's assertion that during this November conversation he asked Blossner to arrange a meeting with the Government, (*see* Tr. at 37, 48), and denied telling Duran that the Government did not want to see him, (*see* Tr. at 48).[17]

After being retained in December of 1997, Blossner attempted to contact Rodas's attorney. (*See* Tr. at 93.) When her counsel did not return his phone calls, Blossner inferred that Rodas was cooperating, and he shared this belief with Duran. (*See id.*) According to Blossner, Duran was certain that Rodas would not cooperate and that her attorney simply must have been too busy to return Blossner's calls. (*See* Tr. at 93–94.) In a later meeting, when Blossner again mentioned that Rodas might be cooperating, he claims Duran denied that was possible and

again asked Blossner to try to get him something better than 70–87 months estimated in the November proposed plea agreement. (*See* Tr. at 94.) Blossner claims to have mentioned cooperation as "a viable alternative," but that Duran "immediately dismissed it, telling [Blossner] that [Rodas] was not cooperating and he was not going to cooperate." (Tr. at 96, 164.) Blossner believed that Duran "clearly understood, during the course of that conversation, what cooperation [wa]s." (Tr. at 94.)

When Blossner approached the Government about the viability of the November plea agreement, he was informed that new information had been uncovered about Duran's criminal culpability, making the estimated sentencing range for the plea much higher. (*See* Tr. at 95.) After Blossner received the Government's January 23, 1998 letter detailing this new information and estimating 135–168 months of incarceration, Blossner met with Duran in person to discuss it, (*see* Tr. at 95–97). Blossner remembered that when he first showed Duran the letter, he "became like a wet rag," apparently shocked that Rodas had cooperated. (Tr. at 96, 168.)

Although Blossner testified that he discussed cooperation with Duran only superficially prior to the January 23rd letter, during this meeting, Blossner explained cooperation to Duran in detail: that Duran would have to be honest with the Government about all his criminal activity, even acts that were not yet uncovered, and that this honesty could bring a motion from the Government asking the judge to downwardly depart from the sentencing guidelines. (*See* Tr. at 97–101, 168.) Blossner claims Duran continued to maintain that he did not want to cooperate, but that he also did not want to go to trial or plead

---

**16.** Blossner's denials are undermined by Sehring's account of Blossner telling her stories about cooperators who received longer sentences than they would have received without cooperating. (*See* Tr. at 223.)

**17.** Blossner guessed that if he did in fact tell Duran the Government did not want to see him, it would have been after receiving the January 1998 letter, not before. (*See* Tr. at 48.)

guilty with the heightened estimated sentence. (*See* Tr. at 99.) No course of action was decided upon at this meeting, and during their next meeting, Duran informed Blossner he wanted to retain another attorney. (*See* Tr. at 168.)

Blossner maintained that Duran never explained the specifics of the heroin conspiracy to him, (*see* Tr. at 32, 165), but Blossner admitted to never having asked Duran for details about his participation in the crimes charged and instead, kept the conversations "superficial as to the facts." (*See* Tr. at 32–33.) No explanation for this approach to representation was offered other than it was his "style in terms of representation." (Tr. at 165.) Blossner also said he did not feel he had any professional or ethical obligation to inquire about the nature of Duran's "friendship" with Rosa, (*see* Tr. at 175–76), and he was certain Duran never volunteered that Rosa was the main purchaser of most of the heroin Duran smuggled into the United States, (*see* Tr. at 32, 153, 155, 165). Blossner was adamant that he was unaware Rosa had been involved in criminal activity with Duran until after Blossner was relieved as counsel in March of 1998. (*See* Tr. at 153–55.) However, as discussed in detail above, *see supra* Background § (1)C, Blossner's course of conduct with other criminal associates of Rosa makes this assertion incredible.

## C. *Duran's Discussions with Rodas and Other Inmates*

Rodas testified that she had three conversations with Duran about cooperation between November 1997 and January 1998. (*See* Tr. at 206). Although she was not certain in what order these conversations occurred, she recalled that "two [took place] at the gate and one in the visiting room" at MDC Brooklyn. (*Id.*) Rodas recalled that in mid-November 1997, Duran

saw her through the gate that separates the men's and women's floors and approached her because he saw she was "very distressed." (Tr. at 188.) Duran told her that "he had asked his attorney [Blossner] for an appointment with the prosecutor" but that Blossner told him "the government didn't want to see him." (Tr. at 191.) Rodas was incredulous that the Government would not want to see Duran, since it was her understanding that the Government wanted "one to clear up one's own situation." (*Id.*) [18] She suggested that Duran get another attorney and offered to collect some names and phone numbers from fellow female inmates. (*See* Tr. at 192.) Duran told Rodas that he did not think he could raise the money to pay for an attorney, (*see id.*), but he accepted the information she collected for him and contacted some of the attorneys she recommended, (*see id.*).

The next conversation Rodas had with Duran took place in the visiting room at MDC Brooklyn sometime in December 1997. (*See* Tr. at 193.) Rodas was cleaning up the room when Duran entered to visit with Campo. (*See* Tr. at 194.) Although they were not able to speak for very long (the female inmates were not supposed to approach the male inmates in the visiting room, (*see id.*)), Rodas asked Duran why he looked so distressed. (*See id.*) Duran responded that he had still been unable to meet with the Government. (*See id.*) Rodas encouraged Duran to keep trying and told him that she was thinking of cooperating with the Government herself, believing it to be "her way out." (Duran Tr. at 478; *see also* Rodas Tr. at 194.) This advice confirmed what some of Duran's fellow inmates had already told him: "that [cooperation] would be a good option." (Tr. at 473; *see id.* at 510.)

---

**18.** According to Rodas, her attorney never told her that an appointment with the Government regarding cooperation could help her receive a lower sentence; instead, she asked her attorney to contact the prosecutor because she was "conscious of the mistake [she] had made, and that [she] had to find a way to make amends." (Tr. at 190.)

Rodas's final conversation with Duran about cooperation occurred in January 1998, on Duran's birthday. (*See* Tr. at 195.) Rodas told Duran she had already met with the Government and "that [she] was very sorry" because she knew Duran would be facing more problems based on what she had revealed to the prosecutor. (*Id.*) She recalled that Duran appeared to "get scared" but that he also reassured her "it was all right," and he was going to continue to try to get his own appointment. (Tr. at 196.)

### D. *Duran's Discussions with Neville*

After receiving a phone call from a person he believes to have been Duran, (*see* Tr. at 392), attorney James Neville ("Neville") visited MDC Brooklyn and met with Duran "a handful of times" beginning in early December 1997 and ending on February 17, 1998, (Tr. at 393). Neville, who speaks Spanish, specifically recalled that Duran was "inhibited about going and speaking to the government." (Tr. at 395.) He believed Duran's inhibitions "had to do with the fact that his then-lawyer had been hired by . . . his former confederates in crime and that he was afraid . . . that word would get back to his confederates that he was going and speaking to the government." (Tr. at 396.) Neville advised Duran to get an attorney he felt comfortable with and could confide in, so that Duran could "act according to however he thought best for his own situation." (*Id.*) Neville quoted a fee to Duran, but was never retained. (*See* Tr. at 397.)

### E. *Duran's Subsequent Cooperation Attempts*

At the end of February or beginning of March 1998, Duran informed Blossner he was going to petition the court to allow him to change counsel. (*See* Tr. at 505.) He told Blossner an elaborate story about needing an operation to correct his vision and wanting to change attorneys so he could stay in New York longer and have the operation. (*See id.*) Duran testified that he concocted this story because he was still "worried about [his] family," (Tr. at 507), and did not want Blossner to tell Rosa and the Colombians that he was fired because he would not take Duran to see the Government, (*see* Tr. at 505–07).

On March 2, 1998, Duran wrote a letter to this court requesting that a new attorney be appointed to represent him. (*See* Letter from Jaime Duran–Benitez to Chambers of 3/2/98.) Duran cited "ineffective assistance of counsel" as the reason for his request. (*Id.*) Duran did not mention Blossner's conflict of interest in the letter for fear the information would reach Rosa and the Colombians, and they would "immediately . . . know what it was that [he] was going to do," (Tr. at 481). However, during the conference, which took place on March 17, 1998, Duran told the court that he needed new counsel because Blossner "was recommended and sent by people who have something to do with [his] case." (Def.'s Ex. D at 6.) Duran explained that he revealed the real reason why he no longer wanted Blossner to be his attorney only when it appeared that he might have to continue with Blossner. (*See* Tr. at 481–82.) After I questioned Blossner about who paid his attorney's fee, Duran's application for new counsel was granted. (*See* Def.'s Ex. D at 8.) A week later, Duran's present counsel was appointed.

Duran further testified that as soon as current counsel explained to him in detail all of his options, including cooperation, he requested a meeting with the Government. (*See* Tr. at 482.) Less than a week later, he met with a prosecutor for the first time. (*See id.*) During this initial meeting, and at least three subsequent meetings, Duran provided the Government with a detailed account of everything he knew about the criminal activities he had been involved in. (*See* Tr. at 482–83.) However, the Government eventually determined this information was stale and did not warrant a

§ 5K1.1 letter.[19]  Thereafter, on November 12, 1998, Duran plead guilty to Count One of the indictment.

### F.  Analysis and Findings

#### 1.  Did Duran understand cooperation?

Duran's claim that cooperation was never explained to him in detail by any attorney before March 1998 is supported by the majority of the evidence on the record. Poreda admitted to not getting into much detail about cooperation during her one substantial meeting with Duran, and Neville's testimony similarly did not recount a detailed cooperation discussion with Duran.

Blossner also testified that he did not fully explain cooperation to Duran at any time before the end of January 1998.  He did, however, claim to have detailed what cooperation entails when he reviewed the January 23, 1998 letter from the Government with Duran.  Blossner's claim, however, is not credible in light of Duran's testimony and the corroborating testimony of Sehring, who was also was represented by Blossner and whose attorney's fee was also paid by Rosa. Sehring credibly testified that while Blossner occasionally mentioned cooperation to her as an option, he never explained it in detail; nor did he tell her it could help her eventually get sentenced below the guideline range. (*See* Tr. at 222, 224, 251.)

The fact that cooperation was never explained to Duran in detail, however, does not mean that he did not understand the essence of cooperation was or how it could benefit him.  On the contrary, the testimony indicates that as early as November 1997, Duran possessed a basic understanding that cooperation could help him get a lower sentence.  Before November, Pore-

da mentioned cooperation as an option for Duran, and, critically, pointed out its requirement of complete truth, as well as its rewards.  Moreover, by late November, Duran's fellow inmates, including Rodas, had advised him that cooperation was "a good option," (Tr. at 473), and Duran himself acknowledged that he understood that speaking with the Government could help his situation, (*see* Tr. at 497).

#### 2.  Did Duran ask to speak with the Government?

Whether Duran actually asked Blossner to schedule a meeting with the Government in late November or early December 1997 is in dispute.  Duran's testimony and Blossner's testimony are directly contradictory on this point.  Duran claims to have repeatedly asked Blossner to take him to see the Government, requests which Blossner responded to by telling Duran the Government did not want to see him.  Blossner, on the other hand, maintains that Duran made it clear from the outset that he was not interested in pursuing cooperation and that Duran changed his mind only when the January 1998 letter from the Government made it clear that Rodas was cooperating.  Although admittedly a difficult determination to make, the weight of the evidence on the record supports Blossner on this point, ironically in good part because of Blossner's unethical conduct and Duran's admitted distrust of Blossner.

Duran was also acutely aware of the risks of cooperating, specifically the jeopardy he and his family would be placed in if he offered the Government information about the Colombian heroin trafficking network he participated in and if the Colombians learned of his attempted cooperation.  Equally relevant was Duran's lack of

---

**19.**  It appears that at the same time Duran began attempting to cooperate with the Government here in the Eastern District of New York (April 1998), other defendants were beginning to proffer information against Rosa in the Middle District of Florida. (*See* Def.'s

Reply at 11.)  Unfortunately for Duran, AUSA Tirschwell was not informed by his counterpart in Florida that the "Danny Rosa" being prosecuted there was the same "Osvaldo Rosa" about whom Duran was offering information. (*See id.*)

confidence in Blossner. His lawyer's disloyalty, of which he was clearly aware, was reason enough for him not to ask for Blossner's assistance. It is difficult to believe Duran would ask Blossner, in whom he rightly had no confidence, to take him to the Government, when as late as March he was using a subterfuge to explain to Blossner why he wanted to change attorneys.

These conclusions are strongly supported by Neville's testimony that Duran's concerns about his safety and about Blossner manifested themselves during their meetings, which began in early December 1997 and continued into February 1998. Neville recalled that Duran seemed concerned about Blossner's connection to his "former confederates" and that he clearly did not trust Blossner. (*See* Tr. at 395–96). Neville also remembered that Duran was hesitant about meeting with the Government, because Duran feared what would happen if word of his cooperation reached Colombia. (*See id.*)

Moreover, Duran's claim that he was fully committed to cooperating as early as late-November or early-December 1997 is belied by the fact that he did not reach out to Poreda for help. Until mid-December, Poreda was Duran's attorney of record, her assistance was being offered at no cost to him, he had her card and could have easily contacted her, and he knew she had the ability to schedule meetings with the Government since she had done exactly that in his case once before. Duran explained that he did not ask for Poreda's help on the advice of fellow inmates who led him to believe that private attorneys were better able to get meetings with the Government. (*See* Tr. 498.)

Supporting Duran's account, on the other hand, is the testimony of Rodas who claimed that ·Duran told her first in mid-November 1997, and then again in December, that Blossner said the Government did not want to see him. As the Government points out, "[Rodas] has been a highly reliable and credible government cooperator and testifying witness.... There was and is little reason to believe that ... she would intentionally lie on behalf of the defendant." (Gov.'s Opp'n at 30.) However, the fact that Rodas testified truthfully and accurately as to what Duran told her does not mean that Duran was telling Rodas the truth to begin with; perhaps Duran did not want Rodas to know he was hesitant to become a cooperator or perhaps he needed a non-embarrassing reason to explain why he was not pursuing cooperation as persistently as she was. In any event, the evidence cited above supports a finding that Duran did not affirmatively ask Blossner to arrange for an appointment with the Government in late 1997, and Rodas's admittedly credible testimony does not directly contradict this conclusion.[20]

Determining that Duran did not ask Blossner to arrange a meeting with the Government for him, however, does not decide the two questions ultimately at issue here—(1) when did Duran decide he wanted to begin cooperating with the Government? and (2) how, if at all, did Blossner's representation affect the outcome of Duran's cooperation? These questions are resolved in the following discussion.

### Discussion

#### (1)

By their very nature, third-party fee arrangements create numerous ethical pit-

**20.** Duran also points to Sehring's testimony that Blossner told her "the prosecutor did not want to speak with [her]," (*see* Tr. at 247), as evidence that Blossner's *modus operandi* was to lie to clients by telling them their offered cooperation was rejected, thus preventing the Government from obtaining information against Rosa. (*See* Def.'s Reply at 6.) However, without calling Sehring's credibility into doubt, her testimony is not dispositive here.

The AUSA who prosecuted Sehring in Florida could not specifically remember whether he spoke with Blossner about obtaining Sehring's cooperation; moreover, it was that prosecutor's normal practice not to actively seek the cooperation of routine drug couriers from Colombia. (*See* Gov.'s Opp'n at 30 n. 7.) Thus, it is not clear that Blossner lied to Sehring when he told her the Government did not want to meet with her.

falls into which even the most wary criminal defense attorney may stumble. The Model Code of Professional Responsibility explicitly warns lawyers of the risks associated with accepting legal fees from someone other than a client. Disciplinary Rule 5–107(A) forbids the acceptance of "compensation for legal services from one other than the client," unless the client consents after the details of the arrangement have been fully disclosed. *New York Code of Professional Responsibility* DR 5–107(A) (Oct.1999) [hereinafter *Code* ]. Rule 5–107 also directs attorneys to guard their professional judgment and duty to their clients against the influence of third-party benefactors. *See id.* DR 5–107(B); *see also Code* EC 5–21 to –24.

These ethical pitfalls become especially dangerous when a defendant's lawyer is hired and paid by "the operator of the alleged criminal enterprise." *Wood v. Georgia,* 450 U.S. 261, 269, 101 S.Ct. 1097, 1102, 67 L.Ed.2d 220 (1981). In such a situation, there is a "[real] risk that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest." *Id.; see also In re: Grand Jury Subpoena Served Upon John Doe, Esq.,* 781 F.2d 238, 248 n. 6 (2d Cir.1986) ("[When] the third party is the head of a criminal enterprise of which the clients are members .... an ethical question arises as to whether the attorney's loyalties are with the client or the payor."). If this risk materializes and an attorney fails to act in the best interests of the client due to the influence of a third-party payor, an actual conflict of interest may arise, depriving the defendant of his or her Sixth Amendment right to effective assistance of counsel and entitling the defendant to an appropriate remedy.

■ An ineffective assistance of counsel claim based on a conflict of interest may be established by a defendant "showing (1) 'an actual conflict of interest' that (2) 'adversely affected his lawyer's perfor-

mance.' " *United States v. Moree,* 220 F.3d 65, 68–69 (2d Cir.2000) (*quoting Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980)). "An attorney labors under an actual conflict of interest ... if, during the course of the representation, the interests of the attorney and his client 'diverge with respect to a material factual or legal issue or to a course of action.' " *Amiel v. United States,* 209 F.3d 195, 198 (2d Cir.2000) (*quoting Cuyler,* 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3 (Marshall, J., concurring in part, dissenting in part)). An attorney's performance is "adversely affected" when the conflict causes an "actual lapse in representation." *Cuyler,* 446 at 349, 100 S.Ct. at 1719. "[A] lapse of representation occurs when counsel, acting under a divided loyalty, forgoes some plausible alternative strategy of defense." *Triana v. United States,* 205 F.3d 36, 41 (2d Cir.2000); *see United States v. Stantini,* 85 F.3d 9, 16 (2d Cir.1996) (holding that an attorney's performance is adversely affected when "some plausible alternative defense strategy or tactic might have been pursued but was not ... undertaken due to the attorney's other loyalties or interests.").

■ Moreover, unlike the showings required for other types of ineffective-assistance-of-counsel claims, a defendant who establishes that an actual conflict of interest existed and caused a lapse of representation need not also establish that he suffered prejudice. *See Strickland v. Washington,* 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). Instead, such defendant is entitled to a presumption of prejudice. *See Smith v. Robbins,* 528 U.S. 259, 120 S.Ct. 746, 765, 145 L.Ed.2d 756 (2000) (" '[P]rejudice is presumed when counsel is burdened by an actual conflict of interest,' *Strickland,* 466 U.S. at 692, 104 S.Ct. [at 2067], although in such a case ... the defendant [must] show that the conflict adversely affected his counsel's performance[ ]."); *Moree,* 220 F.3d 65, 68–69.

Here, the record is replete with evidence that Blossner had an actual conflict of interest from the first moment he met Duran due to Blossner's past and ongoing relationship with Rosa. The testimony offered at the hearing revealed that Blossner repeatedly accepted payment from Rosa for representing various members of Rosa's heroin distribution network who had been arrested, including Duran. However, even if the money that paid Duran's fee came from Rosa's repayment of the debt he owed Duran and from Duran's family in Colombia, the financial interest Blossner had in protecting his patron (Rosa) certainly diverged from his client's interest in obtaining the greatest amount of leniency possible from the Government. Blossner's disloyalty was reprehensible and certainly created an actual conflict of interest.

██ Moreover, the evidence makes equally clear that Blossner's interest in protecting Rosa caused him to engage in behavior designed to dissuade Duran from cooperating, thus precluding a "plausible alternative strategy of defense," *Triana*, 205 F.3d at 41. Generally, Blossner's receipt of payment from Rosa for the representation of his couriers was invariably coupled with Blossner's pattern of not asking these clients any detailed questions about their illegal narcotics activities, discouraging them from cooperating with the Government by telling stories about the dangers of cooperation or by characterizing it as an undesirable option, and, in Sehring's case, condoning false statements made to the Government in order to ensure that Rosa was not incriminated. Specifically, Blossner did not recommend or pursue a cooperation agreement for Duran since such cooperation would surely incriminate Rosa. Failing to explore cooperation on behalf of Duran adversely affected Blossner's performance as his attorney, resulting in a lapse of representation and depriving Duran of his Sixth Amendment right to effective assistance of counsel.

### (2)

Having determined Duran's Sixth Amendment right to effective assistance of counsel was violated by Blossner's conduct, the issue becomes what remedy, if any, Duran is entitled to. Defense counsel urges that a downward departure of ten levels at sentencing is an appropriate remedy for Blossner's ineffective assistance, because the facts here are "unusual enough for [the case] to fall outside the heartland of cases in the [USSG]." *Koon v. United States*, 518 U.S. 81, 98, 116 S.Ct. 2035, 2046, 135 L.Ed.2d 392 (1996); *see also* USSG § 5K2.0 (providing that circumstances of a case that "distinguishes the case from the 'heartland' cases covered by the guidelines" may be considered in determining an appropriate sentence). In making this argument, counsel relies almost exclusively on a similar remedy fashioned for the defendant in *United States v. Gonzalez–Bello*, 10 F.Supp.2d 232 (E.D.N.Y.1998), who was also represented by conflicted counsel.[21] However, two re-

---

21. In *Gonzalez–Bello*, defendant, a twenty-six year old Venezuelan, was sentenced to sixty-three months in prison and four years supervised release for her involvement in a heroin trafficking conspiracy. *See* 10 F.Supp.2d at 233. "This sentence was the result of a sua sponte departure from the sentencing range prescribed by the USSG [viz., 168–210 months of incarceration]." *Id.* The district court determined that a downward departure under § 5K2.0 was warranted due the following combination of factors which took Gonzalez–Bello's case "out of the heartland of typical drug smuggling cases," *id.* at 241:

(a) Gonzalez–Bello wanted to cooperate with the government from the outset of the case; (b) the government wanted her cooperation; (c) her defense lawyer, who suffered from a conflict of interest arising out of his receipt of a "benefactor payment," affirmatively obstructed her effort to cooperate; and (d) the attorney's conduct deprived Gonzalez–Bello of the opportunity to cooperate against at least one drug trafficker, and possible more, and thus to obtain the substantial benefit of a [§ 5K1.1] motion.

*Id.* at 233.

cent opinions issued by the Second Circuit after *Gonzalez–Bello* offer clearer instruction on how to fashion an appropriate remedy for this type of ineffective assistance of counsel claim. *See United States v. Carmichael*, 216 F.3d 224 (2d Cir.2000); *United States v. Bicaksiz*, 194 F.3d 390 (2d Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1175, 145 L.Ed.2d 1083 (2000).

Both *Bicaksiz* and *Carmichael* address whether a defendant's sentence should be reduced due to ineffective assistance of counsel, although the issue arose in the two cases in different procedural settings. In *Bicaksiz*, the defendant appealed a judgment of conviction entered after a jury found him and his co-defendant guilty on two counts of violating the federal "murder-for-hire" statute, 18 U.S.C. § 1958. *See Bicaksiz*, 194 F.3d at 392. Bicaksiz also appealed the denial of his motion for a downward departure for ineffective assistance of counsel. *See id.* Bicaksiz claimed that his attorney had advised him that even if he was convicted of both counts of the indictment, "his maximum sentence would be ten years (the maximum term of imprisonment for a single violation of 18 U.S.C. § 1958)." *Id.* at 397. Instead, Bicaksiz received consecutive sentences of 120 months on count one and 95 months on count two. *See id.* at 393. Bicaksiz claimed that "his attorney's erroneous advice about the maximum sentence prevented him from entering into serious plea discussions with the government." *Id.* at 397.

On the other hand, the defendant in *Carmichael* appealed to the Second Circuit from a resentencing entered after his motion made under 28 U.S.C. § 2255 was granted. *See Carmichael*, 216 F.3d at 225. After pleading guilty to narcotics charges and being sentenced to 151 months of imprisonment, Carmichael first argued on direct appeal that he was entitled to a downward departure due to his counsel's ineffective assistance. *See id.* The Second Circuit dismissed this appeal, noting "that appellant's claims could be raised in a collateral proceeding under 28 U.S.C. § 2255." *Id.* at 226 (*citing United States v. Carmichael*, 50 F.3d 2 (2d Cir. 1995) (unpublished table decision)). After making his § 2255 motion, "[t]he district court found that appellant's counsel had provided him constitutionally ineffective assistance by failing adequately to advise him on whether to accept the government's initial plea offer .... [and] grant[ed] him a two-level downward departure as a remedy for this constitutional violation." *Id.* On appeal, Carmichael challenged the appropriateness of the remedy.

▮ First in *Bicaksiz* and again in *Carmichael*, the Second Circuit held that "ineffective assistance of counsel is not a basis for a downward departure at sentencing." *Bicaksiz*, 194 F.3d at 398; *Carmichael*, 216 F.3d at 227. The court explained in *Bicaksiz* that "[a] downward departure on ineffective assistance grounds is impermissible because it simultaneously assumes the validity of a defendant's conviction and conspicuously calls its validity into question." 194 F.3d at 398. The court further elucidated this rule in *Carmichael*: "Ineffective assistance is a constitutional violation of a defendant's rights and not a mitigating factor to be considered at sentencing or resentencing. Rather, a finding of ineffective assistance requires a remedy

It is noteworthy that the most compelling facts of *GonzalezBello*—namely, the fact that Gonzalez–Bello clearly expressed her desire to cooperate immediately after her arrest and throughout the criminal proceedings, *see id.* at 234–35; the fact that her conflicted attorney not only attempted to discourage her from cooperating, but affirmatively blocked her efforts by falsely informing her she would get the same prison sentence whether she cooperated or went to trial, *see id.* at 235, and by instructing her to falsely deny any involvement in drug trafficking, making "her an unattractive candidate for cooperation," *id.*—are notably absent from the instant case. Thus, the relevance of this precedent is somewhat attenuated.

specifically tailored to the constitutional error." 216 F.3d at 227. The only appropriate remedy for a violation of the Sixth Amendment is to restore the defendant, "as much as possible[,] ... to the circumstances that would have existed had there been no constitutional error." *Id.*

Resting on this prohibition against downwardly departing due to ineffective assistance of counsel, the Second Circuit affirmed the district court's denial of Bicaksiz's motion for a downward departure, "without prejudice to the possible raising of the ineffective-assistance contention in a separate § 2255 motion." *Bicaksiz,* 194 F.3d at 398. Extending this same rule of law to Carmichael's appeal, the court vacated the district court's resentencing because "it failed to give a sufficiently particularized explanation as to why the resentence was an appropriate remedy for counsel's omissions" and remanded the case for further proceedings. *Carmichael,* 216 F.3d at 227.

Following this recent instruction from the Second Circuit, it would appear that

Duran's current motion for a downward departure due to Blossner's ineffective assistance is inappropriate and better left to a motion made under 28 U.S.C. § 2255 after sentence has been imposed. However, as there has already been a full hearing in this case, there seems little point not to apply a § 2255 analysis here.[22]

### (3)

■ Once a Sixth Amendment violation has been established, "[such] deprivation[ is] subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation." *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). As stated above, the proper remedy for an ineffective assistance of counsel claim is to "restore[ ] the defendant to the circumstances that would have existed had there been no constitutional error." *Carmichael,* 216 F.3d at 227. In this case, the appropriate remedy would be, insofar as possible, to sentence Duran to the term of imprisonment he would have received had Blossner never intruded into his case.

---

22. Judge Martin in the Southern District of New York recently applied a § 2255 analysis to a defendant's application for a sua sponte downward departure due to ineffective assistance of counsel. *See United States v. Fernandez,* No. 98–CR–961(JSM), 2000 WL 534449 (S.D.N.Y. May 3, 2000). Like Duran, the defendant in *Fernandez* had not cooperated with the Government and was not entitled to a § 5K1.1 letter; yet, he sought a downward departure from the guideline sentencing range he was facing because his conflicted counsel had failed to give him timely advice regarding cooperating with the Government. *See id.* at *1. Fernandez's attorney had been retained by a third party and had only "discussed the topic of cooperation with his client ... two days before the plea was entered, which was approximately eight months after [ ] Fernandez's arrest." *Id.* An evidentiary hearing was held at which the defendant, his former counsel, and counsel for the Government testified. *See id.*

After finding that Fernandez's attorney had an actual conflict of interest that resulted in a lapse of representation, *see id.* at *2–3, the court concluded that if his attorney had raised the possibility of cooperation earlier in the case, Fernandez would have agreed and ob-

tained a more favorable plea agreement than the one he received. *See id.* at *3. Thus, "the only meaningful remedy the Court [could] fashion [was] to determine what plea agreement the parties would have negotiated had [ ] Fernandez offered to cooperate shortly after his arrest and to give [ ] Fernandez the benefit of that agreement." *Id.* at *4.

The Government objected, arguing that *Bicaksiz* precluded granting a downward departure due to ineffective assistance of counsel. *See id.* at *5. However, the court noted that the Second Circuit in *Bicaksiz* "did not leave the defendant ... without an effective remedy." *Id.* Instead, the ineffective assistance of counsel claim could be considered on a § 2255 motion. *See id.* Since going ahead with the sentencing, "which would [surely] be followed by a predetermined § 2255 proceeding," was an option not found to be "in anyone's interest," *id.* at *6, the court applied the § 2255 analysis standard before sentencing. The court clarified that it was "not granting [Fernandez] a downward departure but [was] simply crafting a remedy that w[ould] result in the defendant being sentenced within the guideline range that he would have been facing if he had had effective assistance of counsel." *Id.* at *6.

While it is always difficult to resolve questions of "what would have been if ...," I am fairly certain that were it not for Blossner's unethical influence, Duran would have pursued cooperation at an earlier date than when he did, although not as early as he claims he would have.

As an initial matter, from listening to and observing the witnesses and reviewing the transcript of the hearing, I am confident that even if Duran was unaware of the precise means of effecting cooperation, he understood its value early on from what he was told about it by Poreda, Rodas, and his fellow inmates. While Blossner's disloyalty was unacceptable and no doubt inhibited Duran's desire to cooperation, Duran was an intelligent and not unsophisticated man. If his friend Rodas innately understood the value of cooperation, *see supra* note 18, Duran certainly did. While Duran justifiably did not trust Blossner, he could easily have contacted Poreda in the first few months after his arrest and asked her advice about how he could safely cooperate. Yet, he chose not to do so.

My conclusion, therefore, is that Duran initially chose not to cooperate because he determined that, on balance, the risk of harm to his family and himself if he cooperated outweighed the risk he faced from the Government. The first proposed plea agreement Duran received from the Government in November of 1997 estimated a period of incarceration ranging from 70–87 months, based on only a small portion of the total amount of heroin Duran was actually responsible for having imported into the United States. In accordance with my earlier findings, *see supra* Background § (2)F.2, this proposed plea agreement did not convince Duran that cooperation was the best way to proceed. Instead, in light of Duran's knowledge of his own culpability, his belief that the Government knew little about him, and the serious risks associated with providing information against Rosa or the Colombians, in Duran's mind

the scale remained tipped in favor of silence.

However, in early January 1998, Rodas told Duran that she had met with the Government and had cooperated against him, an act she knew would increase his troubles. Rodas testified that Duran was visibly shaken by the news—evidence, in my mind, that he was beginning to realize the jeopardy he was putting himself in by not cooperating and how much worse his situation had become. Duran's fears materialized in the January 23, 1998 letter from the Government which, based on the information Rodas had provided, almost doubled Duran's estimated term of incarceration.

I believe these two events added heavy weight to the cooperation side of the scale. Although the risk of retaliation from Rosa and/or the Colombians remained a consideration, the price of silence was no longer acceptable. The balance had come crashing down on the side of cooperation. At this point (late January 1998), I believe Duran would have approached the Government and begun cooperating against Rosa were it not for Blossner's disloyalty. The issue then becomes—was it too late?

Based on the evidence revealed at the hearing, there is no doubt in my mind that Duran possessed information about Rosa and his illegal drug network that the Government would have found valuable. In fact, Duran was not simply a drug courier, but a mid-level manager who, by virtue of his position in the conspiracy, had access to parts of Rosa's importation and distribution scheme that a courier would not. Additionally, with the exception of Rodas, the other cooperators who eventually testified against Rosa—Sehring, Rodriguez, and Garces—did not even begin to proffer information to the Government until April of 1998. Thus, in January, Duran would have found himself in the relatively favorable position of being one of the first to cooperate. Even the Government acknowledges that Duran "still might have been able to testify at the July 1998 trial of

[ ] Rosa if he began to cooperate immediately following the government's January 23, 1998 letter." (Govt.'s Opp'n at 46.)

However, Duran did not begin cooperating until April. At that point, the Government determined that Duran's information was stale and did not warrant a cooperation agreement. The Government attributes this unsuccessful outcome to Duran's poor choice of accepting representation from an attorney who he knew had been sent to him by Rosa. (*See* Govt.'s Opp'n at 47.) However, regardless of what Duran knew or believed about Blossner, there is no evidence that Duran knowingly waived his right to be represented by conflict-free counsel. On the contrary, I believe that the two-month delay was a direct result of the lapse of representation attributable to Blossner's actual conflict of interest. In my mind, Duran reasonably sought to design and execute a plan to have Blossner removed as counsel without alerting him (and through him, Rosa and the Colombians) that Duran wanted to cooperate. This process took time and was not complete until the beginning of April 1998.

■ Blossner's unethical intrusion into Duran's case resulted in a Sixth Amendment violation, which is appropriately remedied by sentencing Duran as if he had been free to pursue cooperation in late January 1998, provided substantial assistance to the Government, and secured a § 5K1.1 letter. The most recent Presentence Report, dated March 16, 1999, assigned Duran a total offense level of 36, a criminal history category of I, and a guideline imprisonment range of 188–235 months. Defendant seeks a 10–level downward departure, with a corresponding guideline imprisonment range of 57–71 months, and suggests that a 60–month term of incarceration is appropriate. (*See* Mem. Supp. Mot. Downward Departure at 47.) However, starting as I usually do with a "ballpark 50% credit" for cooperation, 60 months would be an inappropriately low term of imprisonment, especially considering the amount of heroin Duran is responsible for importing into the United States and his management role in the narcotics conspiracy. Instead, subject to further argument at sentencing, I believe that a downward departure of 6 levels—from a total offense level of 36 to a total offense level of 30—is an accurate estimate of what Duran would have received had he been able to begin cooperating in late January 1998. This down-ward departure has a corresponding imprisonment range of 97–121 months, approximately half of what Duran is currently facing.

### Conclusion

For the reasons stated above, Duran's motion for a downward departure under § 5K2.0 of the United States Sentencing Guidelines is denied. However, treating the application as a § 2255 ineffective assistance of counsel claim, due to Blossner's actual conflict of interest, a 6 level downward departure—from a total offense level of 36 to a total offense level of 30—is presumptively appropriate.

Moreover, the hearing revealed a pattern of unprofessional behavior regularly engaged in by Blossner—behavior that has put his clients at risk and clearly violated the New York Code of Professional Responsibility. Under these circumstance, it is appropriate that I forward a copy of this opinion, along with a copy of the transcripts of the hearing, to the Committee on Grievances of the Eastern District of New York and to the disciplinary committee of the New York State judicial department in which Blossner is admitted to practice. *See* Code of Conduct for United States Judges § 3B(3) ("A judge should initiate appropriate action when the judge becomes aware of reliable evidence indicating the likelihood of unprofessional conduct by a judge or lawyer."). Dated: Brooklyn, New York

SO ORDERED.